# HELLER, SECRETARY, KENTUCKY CABINET FOR HUMAN RESOURCES *v.* DOE, BY HIS MOTHER AND NEXT FRIEND, DOE, ET AL.

No. 92–351.   Argued March 22, 1993—Decided June 24, 1993

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and THOMAS, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 334. BLACKMUN, J., filed a dissenting opinion, *post*, p. 334. SOUTER, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, and in Part II of which O'CONNOR, J., joined, *post*, p. 335.

*William K. Moore* argued the cause for petitioner. With him on the briefs were *Edward D. Klatte* and *Charles P. Lawrence.*

*Kelly Miller* argued the cause for respondents. With her on the brief was *Brian Wolfman.**

JUSTICE KENNEDY delivered the opinion of the Court.

In the Commonwealth of Kentucky, involuntary civil commitments of those alleged to be mentally retarded and of those alleged to be mentally ill are governed by separate statutory procedures. Two differences between these commitment proceedings are at issue in this case. First, at

---

*Briefs of *amici curiae* urging reversal were filed for the State of New Jersey et al. by *Robert J. Del Tufo,* Attorney General, *Joseph L. Yannotti,* Assistant Attorney General, *Mary C. Jacobson,* Senior Deputy Attorney General, and *Sharon M. Hallanan,* Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *Linley E. Pearson* of Indiana, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Don Stenberg* of Nebraska, *Mark Barnett* of South Dakota, and *Mary Sue Terry* of Virginia; for Concerned Families of Hazelwood Center, ICR/MR, Inc., et al. by *Frank Coryell;* and for Voice of the Retarded et al. by *William F. Sherman.*

Briefs of *amici curiae* urging affirmance were filed for the American Association on Mental Retardation et al. by *James W. Ellis* and *Maureen A. Sanders;* and for Focus on Community Understanding and Services, Inc., et al. by *Ronald L. Smith* and *Michael Kirkman.*

*John Townsend Rich, Christopher E. Palmer,* and *Leonard S. Rubenstein* filed a brief for the Mental Health Law Project as *amicus curiae.*

a final commitment hearing, the applicable burden of proof for involuntary commitment based on mental retardation is clear and convincing evidence, Ky. Rev. Stat. Ann. § 202B.160(2) (Michie 1991), while the standard for involuntary commitment based on mental illness is beyond a reasonable doubt, § 202A.076(2). Second, in commitment proceedings for mental retardation, unlike for mental illness, "[g]uardians and immediate family members" of the subject of the proceedings "may participate . . . as if a party to the proceedings," with all attendant rights, including the right to present evidence and to appeal. § 202B.160(3). Respondents are a class of mentally retarded persons committed involuntarily to Kentucky institutions. They argue that these distinctions are irrational and violate the Equal Protection Clause of the Fourteenth Amendment. They claim also that granting close family members and guardians the status of parties violates the Due Process Clause. We reject these contentions and hold the Kentucky statutes constitutional.

I

This case has a long and complicated history. It began in 1982 when respondents filed suit against petitioner, the Kentucky Secretary of the Cabinet for Human Resources, claiming that Kentucky's failure to provide certain procedural protections before institutionalizing people on the basis of mental retardation violated the Constitution. Kentucky has amended its civil commitment statutes several times since 1982, with each new statute being attacked in court by respondents. As the previous incarnations of this lawsuit have little effect on the issues currently before this Court, we limit our discussion to the current round of the litigation. See *Doe* v. *Cowherd*, 770 F. Supp. 354, 355–356 (WD Ky. 1991) (recounting the procedural history).

At issue here are elements of Kentucky's statutory procedures, enacted in 1990, for the involuntary commitment of the mentally retarded. In many respects the procedures

governing commitment of the mentally retarded and the mentally ill are parallel. The statutes recognize a large class of persons who can petition for an individual's involuntary commitment, whether on grounds of mental retardation or mental illness. Ky. Rev. Stat. Ann. § 202B.100(3) (Michie 1991) (mental retardation); § 202A.051 (mental illness). Upon filing of the petition, the trial court must appoint counsel to represent the individual in question, unless he retains private counsel. § 202B.210 (mental retardation); § 202A.121 (mental illness). The trial court also must examine the person who filed the petition and, if there is probable cause to believe that the individual who is the subject of the petition should be involuntarily committed, the court must order his examination by two qualified professionals. §§ 202B.100(5), (6)(c) (mental retardation); §§ 202A.051(5), (6)(c) (mental illness). The subject of the proceeding has the right to retain a professional of his own choosing, who may "witness and participate in any examination" of him. § 202B.140 (mental retardation); § 202A.066 (mental illness). In cases of commitment for mental retardation, a professional retained by the subject's "parent or guardian" also must be permitted to witness and participate in any examination. § 202B.140.

If both qualified professionals certify that the individual meets the criteria for involuntary commitment, the trial court must conduct a preliminary hearing. § 202B.130 (mental retardation); § 202A.061 (mental illness). At the hearing, the court must receive as evidence the reports of these two professionals and any other professional retained under the statute. § 202B.160(1) (mental retardation); § 202A.076(1) (mental illness). The individual whose commitment is sought may testify and may call and cross-examine witnesses. § 202B.160(1) (mental retardation); § 202A.076(1) (mental illness). In cases of mental retardation, at both the preliminary hearing and, if there is one, the final hearing,

Kentucky law provides particular rights to guardians and immediate family members:

> "Guardians and immediate family members of the respondent shall be allowed to attend all hearings, conferences or similar proceedings; may be represented by private counsel, if desired; may participate in the hearings or conferences as if a party to the proceedings; may cross-examine witnesses if desired; and shall have standing to appeal any adverse decision." § 202B.160(3)

See also § 202B.230. If the trial court determines that there is probable cause to believe that the subject should be involuntarily committed, it proceeds to a final hearing. § 202B.100(8) (mental retardation); § 202A.051(9) (mental illness).

At the final hearing, the State, through the county attorney for the county in which the person subject to the proceeding lives, prosecutes the petition, § 202B.019 (mental retardation); § 202A.016 (mental illness); Tr. of Oral Arg. 33–35, and counsel for the person defends against institutionalization, *id.*, at 31, 34, 54. At this hearing, "[t]he manner of proceeding and the rules of evidence shall be the same as those in any criminal proceeding." § 202B.160(2) (mental retardation); § 202A.076(2) (mental illness). As in the preliminary hearing, the subject of the proceedings may testify and call and cross-examine witnesses. § 202B.160(2) (mental retardation); § 202A.076(2) (mental illness). In proceedings for commitment based on mental retardation, the standard of proof is clear and convincing evidence, § 202B.160(2); for mental illness, the standard is proof beyond a reasonable doubt, § 202A.076(2). For commitment of the mentally retarded, four propositions must be proved by clear and convincing evidence: "(1) The person is a mentally retarded person; (2) The person presents a danger or a threat of danger to self, family, or others; (3) The least restrictive alternative mode of treatment presently available requires placement in [a

residential treatment center]; and (4) Treatment that can reasonably benefit the person is available in [a residential treatment center]." § 202B.040. The criteria for commitment of the mentally ill are in substance identical, requiring proof beyond a reasonable doubt that an individual "is a mentally ill person: (1) Who presents a danger or threat of danger to self, family or others as a result of the mental illness; (2) Who can reasonably benefit from treatment; and (3) For whom hospitalization is the least restrictive alternative mode of treatment presently available." § 202A.026. Appeals from involuntary commitment proceedings are taken in the same manner as other appeals from the trial court. § 202B.230 (mental retardation); § 202A.141 (mental illness).

After enactment of the 1990 modifications, respondents moved for summary judgment in their pending lawsuit against petitioner. They argued, among other things, that the differences in treatment between the mentally retarded and the mentally ill—the different standards of proof and the right of immediate family members and guardians to participate as parties in commitment proceedings for the mentally retarded but not the mentally ill—violated the Equal Protection Clause's prohibition of distinctions that lack a rational basis, and that participation by family members and guardians violated the Due Process Clause. The District Court for the Western District of Kentucky accepted these arguments and granted summary judgment to respondents on these and other grounds not at issue here, 770 F. Supp. 354 (1991), and the Court of Appeals for the Sixth Circuit affirmed, *Doe* v. *Cowherd*, 965 F. 2d 109 (1992). We granted Kentucky's petition for certiorari, 506 U. S. 939 (1992), and now reverse.

## II

Respondents contend that, in evaluating the constitutionality of the distinctions drawn by Kentucky's statutes, we should apply not rational-basis review, but some form of

heightened scrutiny. Brief for Respondents 23–32. This claim is not properly presented. Respondents argued before the District Court and the Court of Appeals only that Kentucky's statutory scheme was subject to rational-basis review, and the courts below ruled on that ground. Indeed, respondents have conceded that they pressed their heightened scrutiny argument for the first time in their merits brief in this Court. *Id.*, at 23 ("[R]espondents did not argue this particular issue below . . ."). Even if respondents were correct that heightened scrutiny applies, it would be inappropriate for us to apply that standard here. Both parties have been litigating this case for years on the theory of rational-basis review, which, as noted below, see *infra*, at 320, does not require the State to place any evidence in the record, let alone the extensive evidentiary showing that would be required for these statutes to survive heightened scrutiny. It would be imprudent and unfair to inject a new standard at this stage in the litigation. See *Tennessee* v. *Dunlap*, 426 U. S. 312, 316, n. 3 (1976); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 215 (1976). We therefore decide this case as it has been presented to the courts whose judgments are being reviewed.

## III

We many times have said, and but weeks ago repeated, that rational-basis review in equal protection analysis "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *FCC* v. *Beach Communications, Inc.*, 508 U. S. 307, 313 (1993). See also, *e. g., Dandridge* v. *Williams*, 397 U. S. 471, 486 (1970). Nor does it authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *New Orleans* v. *Dukes*, 427 U. S. 297, 303 (1976) *(per curiam).* For these reasons, a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity.

See, *e. g.*, *Beach Communications, supra,* at 314–315; *Kadrmas* v. *Dickinson Public Schools,* 487 U. S. 450, 462 (1988); *Hodel* v. *Indiana,* 452 U. S. 314, 331–332 (1981); *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976) *(per curiam).* Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. See, *e. g.*, *Nordlinger* v. *Hahn,* 505 U. S. 1, 11 (1992); *Dukes, supra,* at 303. Further, a legislature that creates these categories need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger, supra,* at 15. See also, *e. g.*, *United States Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 179 (1980); *Allied Stores of Ohio, Inc.* v. *Bowers,* 358 U. S. 522, 528 (1959). Instead, a classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications, supra,* at 313. See also, *e. g.*, *Nordlinger, supra,* at 11; *Sullivan* v. *Stroop,* 496 U. S. 478, 485 (1990); *Fritz, supra,* at 174–179; *Vance* v. *Bradley,* 440 U. S. 93, 111 (1979); *Dandridge* v. *Williams, supra,* at 484–485.

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications, supra,* at 315. See also, *e. g.*, *Vance* v. *Bradley, supra,* at 111; *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 812 (1976); *Locomotive Firemen* v. *Chicago, R. I. & P. R. Co.,* 393 U. S. 129, 139 (1968). A statute is presumed constitutional, see *supra,* at 319, and "[t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it," *Lehnhausen* v. *Lake Shore Auto Parts Co.,* 410 U. S. 356, 364 (1973) (internal quotation marks omitted), whether or not the basis has a foundation in the

record. Finally, courts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it " 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Dandridge* v. *Williams, supra,* at 485, quoting *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co.* v. *Chicago,* 228 U. S. 61, 69–70 (1913). See also, *e. g., Burlington Northern R. Co.* v. *Ford,* 504 U. S. 648, 651 (1992); *Vance* v. *Bradley, supra,* at 108, and n. 26; *New Orleans* v. *Dukes, supra,* at 303; *Schweiker* v. *Wilson,* 450 U. S. 221, 234 (1981). We have applied rational-basis review in previous cases involving the mentally retarded and the mentally ill. See *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432 (1985); *Schweiker* v. *Wilson, supra.* In neither case did we purport to apply a different standard of rational-basis review from that just described.

True, even the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation. That requirement is satisfied here. Kentucky has proffered more than adequate justifications for the differences in treatment between the mentally retarded and the mentally ill.

## A

Kentucky argues that a lower standard of proof in commitments for mental retardation follows from the fact that mental retardation is easier to diagnose than is mental illness. That general proposition should cause little surprise, for mental retardation is a developmental disability that becomes apparent before adulthood. See American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Dis-

orders 29 (3d rev. ed. 1987) (hereinafter Manual of Mental Disorders); American Assn. on Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Support 5, 16–18 (9th ed. 1992) (hereinafter Mental Retardation); S. Brakel, J. Parry, & B. Weiner, The Mentally Disabled and the Law 16–17, 37 (3d ed. 1985) (hereinafter Mentally Disabled); Ky. Rev. Stat. Ann. § 202B.010(9) (Michie 1991). By the time the person reaches 18 years of age the documentation and other evidence of the condition have been accumulated for years. Mental illness, on the other hand, may be sudden and may not occur, or at least manifest itself, until adulthood. See, e. g., Manual of Mental Disorders 190 (onset of schizophrenia may occur any time during adulthood); id., at 220, 229 (onset of depression usually is during adulthood). Furthermore, as we recognized in an earlier case, diagnosis of mental illness is difficult. See Addington v. Texas, 441 U. S. 418, 430 (1979). See also Mentally Disabled 18. Kentucky's basic premise that mental retardation is easier to diagnose than is mental illness has a sufficient basis in fact. See, e. g., id., at 16; Ellis & Luckasson, Mentally Retarded Criminal Defendants, 53 Geo. Wash. L. Rev. 414, 438–439 (1985).

This difference between the two conditions justifies Kentucky's decision to assign a lower standard of proof in commitment proceedings involving the mentally retarded. In assigning the burden of proof, Kentucky was determining the "risk of error" faced by the subject of the proceedings. Addington v. Texas, supra, at 423. If diagnosis is more difficult in cases of mental illness than in instances of mental retardation, a higher burden of proof for the former tends to equalize the risks of an erroneous determination that the subject of a commitment proceeding has the condition in question.[1] See G. Keppel, Design and Analysis 65–68 (1973).

---

[1] JUSTICE SOUTER suggests that this description of the function of burdens of proof is inconsistent with Addington v. Texas, 441 U. S. 418 (1979). See post, at 339–341 (dissenting opinion). His reasoning, however, would

From the diagnostic standpoint alone, Kentucky's differential burdens of proof (as well as the other statutory distinction at issue, see *infra*, at 328–329) are rational.

There is, moreover, a "reasonably conceivable state of facts," *Beach Communications*, 508 U. S., at 313, from which Kentucky could conclude that the second prerequisite to commitment—that "[t]he person presents a danger or a threat of danger to self, family, or others," Ky. Rev. Stat. Ann. § 202B.040 (Michie 1991)—is established more easily, as a general rule, in the case of the mentally retarded. Previous instances of violent behavior are an important indicator of future violent tendencies. See, *e. g.*, J. Monahan, The Clinical Prediction of Violent Behavior 71–72 (1981) (hereinafter Monahan); Kozol, Boucher, & Garofalo, The Diagnosis and Treatment of Dangerousness, 18 Crime & Delinquency 371, 384 (1972). Mental retardation is a permanent, relatively static condition, see Mentally Disabled 37, so a determination of dangerousness may be made with some accuracy based on previous behavior. We deal here with adults only, so almost by definition in the case of the retarded there is an 18-year record upon which to rely.

This is not so with the mentally ill. Manifestations of mental illness may be sudden, and past behavior may not be an adequate predictor of future actions. Prediction of future behavior is complicated as well by the difficulties in-

impose the due process conception of burdens of proof on a State's policy decision as to which standard is most appropriate in the circumstances. The Due Process Clause sets the minimum standard of proof required in particular contexts, based on consideration both of the respective interests of the State and individual and of the risk of erroneous decisions. *Addington, supra*, at 425. A State is free to adopt any burden of proof that meets or exceeds the constitutional minimum required by due process, and a State may select a standard of proof based on any rational policy of its choice. It may seek, as JUSTICE SOUTER would require, to balance the respective interests of the affected parties. See *post*, at 339. But it may also calibrate its standard of proof in an effort to establish the risk of error at a certain level.

herent in diagnosis of mental illness. Developments in the Law—Civil Commitment of the Mentally Ill, 87 Harv. L. Rev. 1190, 1242–1243 (1974). It is thus no surprise that many psychiatric predictions of future violent behavior by the mentally ill are inaccurate. See, *e. g.*, Steadman, Employing Psychiatric Predictions of Dangerous Behavior: Policy vs. Fact, in Dangerous Behavior: A Problem in Law and Mental Health 123, 125–128 (C. Frederick ed. 1978); Monahan 47–49. For these reasons, it would have been plausible for Kentucky to conclude that the dangerousness determination was more accurate as to the mentally retarded than the mentally ill.

A statutory classification fails rational-basis review only when it "'rests on grounds wholly irrelevant to the achievement of the State's objective.'" *Holt Civic Club* v. *Tuscaloosa,* 439 U. S. 60, 71 (1978), quoting *McGowan* v. *Maryland,* 366 U. S. 420, 425 (1961). See also, *e. g.*, *McDonald* v. *Board of Election Comm'rs of Chicago,* 394 U. S. 802, 809 (1969); *Kotch* v. *Board of River Port Pilot Comm'rs for Port of New Orleans,* 330 U. S. 552, 556 (1947). Because ease of diagnosis is relevant to two of the four inquiries, it is not "wholly irrelevant" to the achievement of Kentucky's objective, and thus the statutory difference in the applicable burden of proof survives rational-basis review. In any event, it is plausible for Kentucky to have found that, for purposes of determining the acceptable risk of error, diagnosis and dangerousness are the most critical factors in the commitment decision, so the appropriate burden of proof should be tied to them.

There is a further, more far-reaching rationale justifying the different burdens of proof: The prevailing methods of treatment for the mentally retarded, as a general rule, are much less invasive than are those given the mentally ill. The mentally ill are subjected to medical and psychiatric treatment which may involve intrusive inquiries into the patient's innermost thoughts, see Meissner & Nicholi, The Psy-

chotherapies: Individual, Family, and Group, in The Harvard Guide to Modern Psychiatry 357–385 (A. Nicholi ed. 1978) (hereinafter Harvard Guide), and use of psychotropic drugs, see Baldessarini, Chemotherapy, in Harvard Guide 387–431; Berger, Medical Treatment of Mental Illness, 200 Science 974 (1978); Mentally Disabled 327–330; Brief for American Psychological Association as *Amicus Curiae* in *Washington* v. *Harper*, O. T. 1988, No. 88–599, pp. 10–11. By contrast, the mentally retarded in general are not subjected to these medical treatments. Rather, "'because mental retardation is . . . a learning disability and training impairment rather than an illness,'" *Youngberg* v. *Romeo*, 457 U. S. 307, 309, n. 1 (1982), quoting Brief for American Psychiatric Association as *Amicus Curiae* in *Youngberg* v. *Romeo*, O. T. 1981, No. 80–1429, p. 4, n. 1, the mentally retarded are provided "habilitation," which consists of education and training aimed at improving self-care and self-sufficiency skills. See *Youngberg, supra*, at 309, n. 1; M. Rosen, G. Clark, & M. Kivitz, Habilitation of the Handicapped 47–59 (1977); Mentally Disabled 332.

It is true that the loss of liberty following commitment for mental illness and mental retardation may be similar in many respects; but the different treatment to which a committed individual is subjected provides a rational basis for Kentucky to decide that a greater burden of proof is needed before a person may be committed for mental illness. The procedures required before the government acts often depend on the nature and extent of the burden or deprivation to be imposed. See *Addington* v. *Texas*, 441 U. S., at 423–424. For example, because confinement in prison is punitive and hence more onerous than confinement in a mental hospital, *id.*, at 428, the Due Process Clause subjects the former to proof beyond a reasonable doubt, *In re Winship*, 397 U. S. 358 (1970), whereas it requires in the latter case only clear and convincing evidence, *Addington* v. *Texas, supra*. It may also be true that some persons committed for mental retardation are subjected to more intrusive treatments while

confined. See *post*, at 342–346 (SOUTER, J., dissenting). Nonetheless, it would have been plausible for the Kentucky Legislature to believe that most mentally retarded individuals who are committed receive treatment that is different from, and less invasive than, that to which the mentally ill are subjected. "States are not required to convince the courts of the correctness of their legislative judgments." *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 464 (1981). Thus, since "'the question is at least debatable,'" *Western & Southern Life Ins. Co.* v. *State Bd. of Equalization of Cal.*, 451 U. S. 648, 674 (1981), quoting *United States* v. *Carolene Products Co.*, 304 U. S. 144, 154 (1938), rational-basis review permits a legislature to use just this sort of generalization.

These distinctions may explain, too, the differences in treatment between the mentally retarded and the mentally ill that have long existed in Anglo-American law. At English common law there was a "marked distinction" in the treatment accorded "idiots" (the mentally retarded) and "lunatics" (the mentally ill). 1 F. Pollock & F. Maitland, The History of English Law 481 (2d ed. 1909) (hereinafter Pollack and Maitland). As Blackstone explained, a retarded person became a ward of the King, who had a duty to preserve the individual's estate and provide him with "necessaries," but the King could profit from the wardship. In contrast, the King was required to "provide for the custody and sustentation of [the mentally ill], and preserve their lands and the profits of them," but the King was prohibited from profiting thereby. 1 W. Blackstone, Commentaries *302–*304. See Pollack and Maitland 481; S. Herr, Rights and Advocacy for Retarded People 9–10 (1983).

Ancient lineage of a legal concept does not give it immunity from attack for lacking a rational basis. That the law has long treated the classes as distinct, however, suggests that there is a commonsense distinction between the men-

tally retarded and the mentally ill. The differentiation continues to the present day. A large majority of States have separate involuntary commitment laws for the two groups,[2]

---

[2] Ala. Code § 22–52–50 *et seq.* (1990) (mental retardation); § 22–52–1 *et seq.* (Supp. 1992) (mental illness); Alaska Stat. Ann. § 47.30.700 *et seq.* (1990) (mental illness); Ariz. Rev. Stat. Ann. § 36–533 *et seq.* (1986 and Supp. 1992) (mental illness); Ark. Code Ann. § 20–48–404 (1991) (mental retardation); § 20–47–207 (mental illness); Calif. Welf. & Inst. Code Ann. § 6500 *et seq.* (West 1984 and Supp. 1993) (mental retardation); § 5200 *et seq.* (mental illness); Colo. Rev. Stat. § 27–10–105 *et seq.* (1989 and Supp. 1992) (mental illness); Conn. Gen. Stat. § 17a–274 *et seq.* (1993) (mental retardation); § 17a–495 *et seq.* (mental illness); Del. Code Ann., Tit. 16, § 5522 (1983) (mental retardation); § 5001 *et seq.* (1983 and Supp. 1992) (mental illness); D. C. Code Ann. §§ 6–1924, 6–1941 *et seq.* (1989) (mental retardation); § 21–541 *et seq.* (mental illness); Fla. Stat. § 393.11 *et seq.* (Supp. 1992) (mental retardation); §§ 394.463, 394.467 (1986 and Supp. 1992) (mental illness); Ga. Code Ann. § 37–4–40 *et seq.* (Supp. 1992) (mental retardation); § 37–3–40 *et seq.* (1982 and Supp. 1992) (mental illness); Haw. Rev. Stat. § 334–60.2 *et seq.* (1985 and Supp. 1992) (mental illness); Idaho Code § 66–406 (1989) (mental retardation); § 66–329 (Supp. 1992) (mental illness); Ill. Rev. Stat., ch. 91½, ¶ 4–500 *et seq.* (1991) (mental retardation); ¶ 3–700 *et seq.* (mental illness); Ind. Code § 12–26–7–1 *et seq.* (Burns 1992) (mental illness); Iowa Code § 222.16 *et seq.* (1987) (mental retardation); § 229.6 *et seq.* (mental illness); Kan. Stat. Ann. § 59–2912 *et seq.* (1983 and Supp. 1990) (mental illness); Ky. Rev. Stat. Ann. §§ 202B.040, 202B.100 *et seq.* (Michie 1991) (mental retardation); §§ 202A.026, 202A.051 *et seq.* (mental illness); La. Rev. Stat. Ann. § 28:404 (West 1989) (mental retardation); § 28:54 *et seq.* (West 1989 and Supp. 1993) (mental illness); Me. Rev. Stat. Ann., Tit. 34–B, § 5474 *et seq.* (1988) (mental retardation); § 3864 (mental illness); Md. Health Code Ann. § 7–502 *et seq.* (1990) (mental retardation); § 10–613 *et seq.* (mental illness); Mass. Gen. Laws ch. 123, § 5 *et seq.* (1989) (mental illness); Mich. Comp. Laws § 330.1515 *et seq.* (1981) (mental retardation); § 330.1434 *et seq.* (mental illness); Mo. Rev. Stat. § 632.300 *et seq.* (1988) (mental illness); Mont. Code Ann. § 53–20–121 *et seq.* (1991) (mental retardation); § 53–21–121 *et seq.* (mental illness); Neb. Rev. Stat. § 83–1020 *et seq.* (1987 and Supp. 1992) (mental illness); Nev. Rev. Stat. § 435.123 *et seq.* (1991) (mental retardation); § 433A.200 *et seq.* (mental illness); N. H. Rev. Stat. Ann. § 171–A:10(II) (1990) (mental retardation); § 135–C:34 *et seq.* (mental illness); N. J. Stat. Ann. § 30:4–27.10 (West Supp. 1993) (mental illness); N. M. Stat. Ann. § 43–1–13 (1989) (mental retardation); § 43–1–10

and many States as well have separate agencies for addressing their needs.[3]

Kentucky's burden of proof scheme, then, can be explained by differences in the ease of diagnosis and the accuracy of the prediction of future dangerousness and by the nature of the treatment received after commitment. Each of these rationales, standing on its own, would suffice to establish a rational basis for the distinction in question.

## B

There is a rational basis also for the other distinction challenged by respondents: that Kentucky allows close relatives

_et seq._ (mental illness); N. Y. Mental Hyg. Law § 15.27 _et seq._ (McKinney 1988) (mental retardation); § 9.27 _et seq._ (mental illness); N. D. Cent. Code § 25–03.1–07 _et seq._ (1989) (mental illness); Ohio Rev. Code Ann. § 5123.71 _et seq._ (1989 and Supp. 1992) (mental retardation); § 5122.11 _et seq._ (mental illness); Okla. Stat., Tit. 43A, § 5–401 (Supp. 1993) (mental illness); Ore. Rev. Stat. § 427.215 _et seq._ (1991) (mental retardation); § 426.070 _et seq._ (mental illness); Pa. Stat. Ann., Tit. 50, § 4406 (Purdon 1969 and Supp. 1992) (mental retardation); § 7301 _et seq._ (mental illness); R. I. Gen. Laws § 40.1–22–9 _et seq._ (1990) (mental retardation); § 40.1–5–8 (mental illness); S. C. Code Ann. § 44–20–450 (Supp. 1992) (mental retardation); § 44–17–510 _et seq._ (1985) (mental illness); S. D. Codified Laws § 27B–7–1 _et seq._ (1992) (mental retardation); § 27A–10–1 _et seq._ (mental illness); Tenn. Code Ann. § 33–6–103 _et seq._ (Supp. 1992) (mental illness); Tex. Health & Safety Code Ann. § 593.041 _et seq._ (1992) (mental retardation); § 574.001 _et seq._ (mental illness); Utah Code Ann. § 62A–5–312 (Supp. 1992) (mental retardation); § 62A–12–234 (mental illness); Vt. Stat. Ann., Tit. 18, § 8822 _et seq._ (1987) (mental retardation); § 7612 _et seq._ (mental illness); Va. Code Ann. § 37.1–67.1 _et seq._ (1984 and Supp. 1992) (mental illness); Wyo. Stat. § 25–5–119 (1990 and Supp. 1992) (mental retardation); § 25–10–110 (mental illness).

But see Minn. Stat. § 253B.07 _et seq._ (1992) (mental retardation and mental illness); Miss. Code Ann. § 41–21–61 _et seq._ (Supp. 1992) (mental retardation and mental illness); N. C. Gen. Stat. § 122C–261 _et seq._ (1989 and Supp. 1992) (mental retardation and mental illness); Wash. Rev. Code § 71.05.150 _et seq._ (1992 and Supp. 1993) (mental retardation and mental illness); W. Va. Code § 27–5–2 _et seq._ (1992) (mental retardation and mental illness); Wis. Stat. § 51.20 (1989–1990) (mental retardation and mental illness).

[3] See Brief for New Jersey et al. as _Amici Curiae_ 7, 1a.

and guardians to participate as parties in proceedings to commit the mentally retarded but not the mentally ill. As we have noted, see *supra*, at 321–322, by definition, mental retardation has its onset during a person's developmental period. Mental retardation, furthermore, results in "deficits or impairments in adaptive functioning," that is to say, "the person's effectiveness in areas such as social skills, communication, and daily living skills, and how well the person meets the standards of personal independence and social responsibility expected of his or her age by his or her cultural group." Manual of Mental Disorders 28–29. See also Mental Retardation 5–6, 15–16, 38–41. Based on these facts, Kentucky may have concluded that close relatives and guardians, both of whom likely have intimate knowledge of a mentally retarded person's abilities and experiences, have valuable insights that should be considered during the involuntary commitment process.

Mental illness, by contrast, may arise or manifest itself with suddenness only after minority, see *supra*, at 322, when the afflicted person's immediate family members have no knowledge of the medical condition and have long ceased to provide care and support. Further, determining the proper course of treatment may be far less dependent upon observations made in a household setting. Indeed, we have noted the severe difficulties inherent in psychiatric diagnosis conducted by experts in the field. *Addington* v. *Texas*, 441 U. S., at 430. See also Mentally Disabled 18. In addition, adults previously of sound mental health who are diagnosed as mentally ill may have a need for privacy that justifies the State in confining a commitment proceeding to the smallest group compatible with due process. Based on these facts, Kentucky may have concluded that participation as parties by relatives and guardians of the mentally ill would not in most cases have been of sufficient help to the trier of fact to justify the additional burden and complications of granting party status. To be sure, Kentucky could have provided rel-

atives and guardians of the mentally retarded some participation in commitment proceedings by methods short of providing them status as parties. That, however, is irrelevant in rational-basis review. We do not require Kentucky to have chosen the least restrictive means of achieving its legislative end. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 51 (1973). As long as Kentucky "rationally advances a reasonable and identifiable governmental objective, we must disregard" the existence of alternative methods of furthering the objective "that we, as individuals, perhaps would have preferred." *Schweiker* v. *Wilson,* 450 U. S., at 235.

## IV

We turn now to respondents' claim that one aspect of the involuntary commitment procedures violates procedural due process. We note at the outset that respondents challenge as violative of due process only those provisions of Kentucky's comprehensive involuntary commitment procedures that allow participation in the proceedings by guardians and immediate family members. See Ky. Rev. Stat. Ann. §§ 202B.140, 202B.160(3), 202B.230 (Michie 1991). Respondents claim that by allowing the participation of persons whose interests may be adverse to those of the individual facing possible involuntary commitment, the statute "skews the balance" against the retarded individual and therefore imposes a burden on him. Brief for Respondents 32–36. Both courts below apparently accepted this argument, almost without explanation. See 965 F. 2d, at 113; 770 F. Supp., at 358. In our view, the claim is without merit.

We evaluate the sufficiency of this procedural rule under *Mathews* v. *Eldridge,* 424 U. S. 319 (1976). There we held that determining the dictates of due process requires consideration of three factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous depriva-

tion of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.*, at 335.

We think that application of the *Mathews* v. *Eldridge* factors compels the conclusion that participation as parties by close relatives and legal guardians is not a deprivation of due process. Even if parents, close family members, or legal guardians can be said in certain instances to have interests "adverse to [those of] the person facing commitment," 965 F. 2d, at 113, we simply do not understand how their participation as formal parties in the commitment proceedings increases "the risk of an erroneous deprivation," 424 U. S., at 335, of respondents' liberty interest. Rather, for the reasons explained, *supra*, at 329, these parties often will have valuable information that, if placed before the court, will increase the accuracy of the commitment decision. Kentucky law, moreover, does not allow intervention by persons who lack a personal stake in the outcome of the adjudication. Guardians have a legal obligation to further the interests of their wards, and parents and other close relatives of a mentally retarded person, after living with and caring for the individual for 18 years or more, have an interest in his welfare that the State may acknowledge. See *Parham* v. *J. R.*, 442 U. S. 584, 602–603 (1979). For example, parents who for 18 years or longer have cared for a retarded child can face changed circumstances resulting from their own advancing age, when the physical, emotional, and financial costs of caring for the adult child may become too burdensome for the child's best interests to be served by care in their home. There is no support whatever in our cases or our legal tradition for the "statist notion," *id.*, at 603, that the State's expertise and concern in these matters is so superior to that of parents and other close family members that the State must

slam the courthouse door against those interested enough to intervene. Finally, "the state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable . . . to care for themselves," as well as "authority under its police power to protect the community" from any dangerous mentally retarded persons. *Addington*, 441 U. S., at 426.

To be sure, if the additional parties involved in the proceedings favor commitment, their participation may increase the chances that the result of the proceeding will be a decision to commit. That fact, however, is beside the point. "The Due Process Clause does not . . . require a State to adopt one procedure over another on the basis that it may produce results more favorable to" the party challenging the existing procedures. *Medina* v. *California*, 505 U. S. 437, 451 (1992).

> "The function of legal process, as that concept is embodied in the Constitution, and in the realm of factfinding, is to minimize the risk of erroneous decisions. Because of the broad spectrum of concerns to which the term must apply, flexibility is necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." *Greenholtz* v. *Inmates of Neb. Penal and Correctional Complex*, 442 U. S. 1, 13 (1979).

See also *Fuentes* v. *Shevin*, 407 U. S. 67, 97 (1972) (due process functions to "prevent unfair and mistaken deprivations"). At least to the extent protected by the Due Process Clause, the interest of a person subject to governmental action is in the accurate determination of the matters before the court, not in a result more favorable to him. So long as the accuracy of the adjudication is unaffected, therefore, the Due Process Clause does not prevent a State from allowing the intervention of immediate family members and legal guard-

ians, even if in some instances these parties will have interests adverse to those of the subject of the proceedings. Neither respondents nor their *amici* have suggested that accuracy would suffer from the intervention allowed by Kentucky law, and as noted above we think quite the opposite is true.

Because allowing guardians and immediate family members to participate as parties in commitment proceedings increases the accuracy of those proceedings and implements the State's interest in providing family members a voice in the proceedings, without undermining those interests of the individual protected by the Due Process Clause, these Kentucky statutes do not run afoul of due process. "We deal here with issues of unusual delicacy, in an area where professional judgments regarding desirable procedures are constantly and rapidly changing. In such a context, restraint is appropriate on the part of courts called upon to adjudicate whether a particular procedural scheme is adequate under the Constitution." *Smith* v. *Organization of Foster Families for Equality & Reform,* 431 U. S. 816, 855–856 (1977).

## V

In sum, there are plausible rationales for each of the statutory distinctions challenged by respondents in this case. It could be that "[t]he assumptions underlying these rationales [are] erroneous, but the very fact that they are 'arguable' is sufficient, on rational-basis review, to 'immunize' the [legislative] choice from constitutional challenge." *Beach Communications,* 508 U. S., at 320, quoting *Vance* v. *Bradley,* 440 U. S., at 112.[4]

---

[4] Under a previous version of Kentucky's laws relating to the commitment of the mentally retarded, application by the parents or guardian of a mentally retarded person for placement in a mental retardation treatment center was treated as a voluntary commitment to which the procedural requirements of involuntary commitments were inapplicable. See Ky. Rev. Stat. Ann. § 202B.040 (Michie 1982 and Supp. 1986). In a previous

The judgment of the Court of Appeals for the Sixth Circuit is

*Reversed.*

JUSTICE O'CONNOR, concurring in the judgment in part and dissenting in part.

I agree with JUSTICE SOUTER that Kentucky's differential standard of proof for committing the mentally ill and the mentally retarded is irrational and therefore join Part II of his opinion. I conclude, however, that there is a rational basis for permitting close relatives and guardians to participate as parties in proceedings to commit the mentally retarded but not the mentally ill. As the Court points out, there are sufficiently plausible and legitimate reasons for the legislative determination in this area. I also agree with the Court that allowing guardians and immediate family members to participate as parties in commitment proceedings does not violate procedural due process. Like my colleagues, I would not reach the question whether heightened equal protection scrutiny should be applied to the Kentucky scheme.

JUSTICE BLACKMUN, dissenting.

I join JUSTICE SOUTER's dissenting opinion, for I agree with him that this statute is not even rational. I write sepa-

---

decision, the Court of Appeals held that persons committed upon application of parents or guardians must be considered to have been admitted involuntarily. *Doe* v. *Austin,* 848 F. 2d 1386, 1391–1392 (CA6 1988). We denied Kentucky's petition for certiorari from this decision, 488 U. S. 967 (1988), and Kentucky subsequently amended its statutes to remove this provision. In its brief, however, Kentucky again attacks this prior holding of the Court of Appeals. See Brief for Petitioner 20–28. Even were this issue not mooted by the repeal of the provision at issue, see, *e. g.,* *Department of Treasury* v. *Galioto,* 477 U. S. 556, 559–560 (1986); *Kremens* v. *Bartley,* 431 U. S. 119, 128–129 (1977), it is not "fairly included" within the questions on which we granted certiorari, this Court's Rule 14.1(a). See Pet. for Cert. i.

rately only to note my continuing adherence to the view that laws that discriminate against individuals with mental retardation, *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 455 (1985) (opinion of Marshall, J., joined by Brennan and BLACKMUN, JJ.), or infringe upon fundamental rights, *Foucha* v. *Louisiana*, 504 U. S. 71, 84–86 (1992) (plurality opinion of WHITE, J., joined by BLACKMUN, STEVENS, and SOUTER, JJ.), are subject to heightened review.

JUSTICE SOUTER, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, and with whom JUSTICE O'CONNOR joins as to Part II, dissenting.

Because I conclude that Kentucky's provision of different procedures for the institutionalization of the mentally retarded and the mentally ill is not supported by any rational justification, I respectfully dissent.

I

To begin with, the Court declines to address Doe's argument that we should employ strict or heightened scrutiny in assessing the disparity of treatment challenged here.[1]

---

[1] Doe relies, first, on the nature of the right at stake, citing our decision last Term in *Foucha* v. *Louisiana*, 504 U. S. 71 (1992). There we were faced with an equal protection challenge to a Louisiana statute authorizing continued commitment of currently sane insanity acquittees under standards that were not applied to criminal convicts who had completed their prison terms or were about to do so. The insanity acquittee was kept incarcerated in a mental institution unless he could prove he was not dangerous, see La. Code Crim. Proc. Ann., Art. 657 (West Supp. 1993), whereas "Louisiana law," as JUSTICE WHITE wrote, did "not provide for similar confinement for other classes of persons who have committed criminal acts and who cannot later prove they would not be dangerous. Criminals who have completed their prison terms, or are about to do so, are an obvious and large category of such persons . . . . However, state law does not allow for th[e] continuing confinement [of criminals who may be unable to prove they would not be dangerous] based merely on dangerousness. . . . Freedom from physical restraint being a fundamental right, the State must have a particularly convincing reason, which it has not put forward,

While I may disagree with the Court's basis for its conclusion that this argument is not "properly presented," *ante*, at 319, I too would decline to address the contention that strict or heightened scrutiny applies. I conclude that the distinctions wrought by the Kentucky scheme cannot survive even that rational-basis scrutiny, requiring a rational relationship

for such discrimination against insanity acquittees who are no longer mentally ill." *Foucha*, 504 U. S., at 85–86 (plurality opinion of WHITE, J., joined by BLACKMUN, STEVENS, and SOUTER, JJ.); see also *id.*, at 88 (O'CONNOR, J., concurring in part and concurring in judgment) ("Although I think it unnecessary to reach equal protection issues on the facts before us, the permissibility of holding an acquittee who is not mentally ill longer than a person convicted of the same crimes could be imprisoned is open to serious question"). Because of the "'massive curtailment of liberty'" undoubtedly involved in involuntary civil commitment and institutionalization, see *Vitek* v. *Jones*, 445 U. S. 480, 491 (1980) (quoting *Humphrey* v. *Cady*, 405 U. S. 504, 509 (1972)), Doe argues that heightened scrutiny applies under *Foucha* when those alleged to be mentally retarded are denied the protection afforded another "obvious and large category" of potential civil committees, those said to be mentally ill.

Doe also argues that the discrimination here has a second aspect that justifies application of strict or heightened scrutiny, in its classification on the basis of mental retardation. Although he recognizes that this Court held in 1985 that retarded individuals are not a quasi-suspect class, see *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 442–447 (1985), he argues that the subsequently enacted Americans With Disabilities Act of 1990 (ADA) amounts to an exercise of Congress's power under § 5 of the Fourteenth Amendment to secure the guarantees of the Equal Protection Clause to the disabled. See *Katzenbach* v. *Morgan*, 384 U. S. 641, 651 (1966). The ADA includes findings that people with disabilities (among whom are included those with mental impairments that Doe argues include mental retardation, see 42 U. S. C. § 12102(2)(A) (1988 ed., Supp. III)) "are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society . . . ." § 12101(a)(7). Doe argues that this and other findings, together with expressions of purpose contained in the ADA, amount to a clear indication from Congress "that all individuals with disabilities, including individuals with mental retardation should be treated as a suspect class." Brief for Respondents 29–30.

between the disparity of treatment and some legitimate governmental purpose, which we have previously applied to a classification on the basis of mental disability, see *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 446–447 (1985), and therefore I need not reach the question of whether scrutiny more searching than *Cleburne*'s should be applied.[2] *Cleburne* was the most recent instance in which we addressed a classification on the basis of mental disability, as we did by enquiring into record support for the State's proffered justifications, and examining the distinction in treatment in light of the purposes put forward to support it. See *id.*, at 450. While the Court cites *Cleburne* once, and does not purport to overrule it, neither does the Court apply it, and at the end of the day *Cleburne*'s status is left uncertain. I would follow *Cleburne* here.

## II

Obviously there are differences between mental retardation and mental illness. They are distinct conditions, they have different manifestations, they require different forms of care or treatment, and the course of each differs. It is without doubt permissible for the State to treat those who are mentally retarded differently in some respects from those who are mentally ill. The question here, however, is whether some difference between the two conditions ration-

---

[2] This approach complies with "two of the cardinal rules governing the federal courts: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 501 (1985) (citations, internal quotation marks, and brackets omitted), and is consistent with our past practice. See, *e. g., Hooper* v. *Bernalillo County Assessor*, 472 U. S. 612, 618 (1985) (declining to decide whether to apply heightened scrutiny where classification failed rational-basis test); cf. *Mississippi Univ. for Women* v. *Hogan*, 458 U. S. 718, 724, n. 9 (1982) (declining to decide whether to apply strict scrutiny where classification could not survive heightened scrutiny).

ally can justify the particular disparate treatment accorded under this Kentucky statute.

The first distinction wrought by the statute is the imposition of a lesser standard of proof for involuntary institutionalization where the alleged basis of a need for confinement is mental retardation rather than mental illness. As the Court observes, four specific propositions must be proven before a person may be involuntarily institutionalized on the basis of mental retardation: "that: (1) [t]he person is a mentally retarded person; (2) [t]he person presents a danger or a threat of danger to self, family, or others; (3) [t]he least restrictive alternative mode of treatment presently available requires placement in [a state-run institution]; and (4) [t]reatment that can reasonably benefit the person is available in [a state-run institution]." Ky. Rev. Stat. Ann. § 202B.040 (Michie 1991). At issue in this case is only the application of this provision to adults who have not been shown to be mentally retarded, but who are simply alleged to be. The subject of such a proceeding retains as full an interest in liberty as anyone else. The State of Kentucky has deemed this liberty interest so precious that, before one may be institutionalized on the basis of mental illness, the statutory prerequisites must be shown "beyond a reasonable doubt." § 202A.076(2).[3] However, when the allegation against the individual is one of mental retardation, he is deprived of the protection of that high burden of proof. The first question here, then, is whether, in light of the State's decision to provide that high burden of proof in involuntary commitment

---

[3] As the Court notes, the statutory prerequisites are substantially identical for commitment on the basis of illness and retardation. Commitment on the ground of mental illness requires proof beyond a reasonable doubt that an individual "is a mentally ill person: (1) [w]ho presents a danger or threat of danger to self, family or others as a result of the mental illness; (2) [w]ho can reasonably benefit from treatment; and (3) [f]or whom hospitalization is the least restrictive alternative mode of treatment presently available." Ky. Rev. Stat. Ann. § 202A.026 (Michie 1991).

proceedings where illness is alleged, there is something about mental retardation that can rationally justify provision of less protection.

In upholding this disparate treatment, the Court relies first on the State's assertion that mental retardation is easier to diagnose than mental illness. It concludes that the discrimination in burdens of proof is rational because the lessened "'risk of error'" resulting from the higher burden of proof, see *ante*, at 322 (quoting *Addington* v. *Texas*, 441 U. S. 418, 423 (1979)), can be understood to offset a greater "ris[k] of an erroneous determination that the subject of a commitment proceeding has the condition in question" when the allegation is one of mental illness rather than mental retardation, *ante*, at 322. The Court reaches essentially the same conclusion with respect to the second prerequisite, that the individual present a danger or threat of danger to himself or others. See *ante*, at 324 (a determination of dangerousness may be made with "more accura[cy]" with respect to the mentally retarded than the mentally ill).

In concluding, however, that the demands of minimal rationality are satisfied if burdens of proof rise simply with difficulties of proof, the Court misunderstands the principal object in setting burdens. It is no coincidence that difficult issues in civil cases are not subject to proof beyond a reasonable doubt and that even the most garden variety elements in criminal cases are not to be satisfied by a preponderance of evidence. The reason for this is that burdens of proof are assigned and risks of error are allocated not to reflect the mere difficulty of avoiding error, but the importance of avoiding it as judged after a thorough consideration of those respective interests of the parties that will be affected by the allocation. See *Addington*, 441 U. S., at 425.

In a civil commitment proceeding, on the State's side of the balance, are the interests of protecting society from those posing dangers and protecting the ill or helpless individual from his own incapacities. *Id.*, at 426. On the other

side, it is clear that "[i]n cases involving individual rights, whether criminal or civil, '[t]he standard of proof [at a minimum] reflects the value society places on individual liberty,'" *id.*, at 425 (brackets in original and citation omitted), which encompasses both freedom from restraint and freedom from the stigma that restraint and its justifications impose on an institutionalized person, *id.*, at 425–426.

The question whether a lower burden of proof is rationally justified, then, turns not only on whether ease of diagnosis and proof of dangerousness differ as between cases of illness and retardation, but also on whether there are differences in the respective interests of the public and the subjects of the commitment proceedings, such that the two groups subject to commitment can rationally be treated differently by imposing a lower standard of proof for commitment of the retarded.[4] The answer is clearly that they cannot. While difficulty of proof, and of interpretation of evidence, could legitimately counsel against setting the standard so high that the State may be unable to satisfy it (thereby effectively thwarting efforts to satisfy legitimate interests in protection, care, and treatment), see *id.*, at 429, that would at most justify a lower standard in the allegedly more difficult cases of illness, not in the easier cases of retardation. We do not lower burdens of proof merely because it is easy to prove the proposition at issue, nor do we raise them merely because it is difficult.[5] Nor do any other reasonably conceivable facts

---

[4] In addition to the two prerequisites mentioned in the text, the State must also prove that commitment would be beneficial and the least restrictive alternative method of treatment. The Court does not contend that there is any rational justification for imposition of a lowered burden of proof with respect to these prerequisites for institutionalization in those cases where the allegation is one of retardation and not illness. See *ante*, at 324.

[5] And indeed, to the extent *Addington* v. *Texas*, 441 U. S. 418 (1979), does discuss the difficulty of diagnosing mental illness, see *id.*, at 429–430, it supports use only of a *lesser* standard of proof because of the practical problems created by a supposed "serious question as to whether a state

cut in favor of the distinction in treatment drawn by the Kentucky statute. Both the ill and the retarded may be dangerous, each may require care, and the State's interest is seemingly of equal strength in each category of cases. No one has or would argue that the value of liberty varies somehow depending on whether one is alleged to be ill or retarded, and a mentally retarded person has as much to lose by civil commitment to an institution as a mentally ill counterpart, including loss of liberty to "choos[e] his own friends and companions, selec[t] daily activities, decid[e] what to eat, and retai[n] a level of personal privacy," among other things. Brief for American Association on Mental Retardation (AAMR) et al. as *Amici Curiae* 12 (AAMR Br.). We do not presume that a curtailment of the liberty of those who are disabled is, because of their disability, less severe than the same loss to those who are ill. Even if the individuals subject to involuntary commitment proceedings previously had been shown to be mentally retarded, they would thus still retain their "strong," legally cognizable interest in their liberty. Cf. *Foucha*, 504 U. S., at 88 (O'CONNOR, J., concurring in part and concurring in judgment). Even assuming, then, that the assertion of different degrees of difficulty of proof both of mental illness and mental retardation and of the dangerousness inherent in each condition is true (an assertion for which there is no support in the record), it lends not a shred of rational support to the decision to discriminate against the retarded in allocating the risk of erroneous curtailment of liberty.

The Court also rests its conclusion on the view that "it would have been plausible for the Kentucky Legislature to believe that most mentally retarded individuals who are

---

could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous," *id.*, at 429. Of course, in this case Kentucky has determined that the liberty of those alleged to be mentally ill is sufficiently precious that the State should assume the risk inherent in use of that higher standard.

committed receive treatment that is . . . less invasive tha[n] that to which the mentally ill are subjected." *Ante,* at 326. Nothing cited by the Court, however, demonstrates that such a belief would have been plausible for the Kentucky Legislature, nor does the Court's discussion render it plausible now. Cf. *United States Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166, 179 (1980) (under rational-basis scrutiny disparate treatment must be justified by "plausible reasons"). One example of the invasiveness to which the Court refers is the use of (and the results of the administration of) psychotropic drugs. I take no exception to the proposition that they are extensively used in treating mental illness. See *ante,* at 325 (citing authorities for the proposition that drugs are used in treating mental illness). Nor do I except to the proposition that the appropriate and perhaps characteristic response to mental retardation, but not to mental illness, is that kind of training in the necessities of self-sufficiency known as "habilitation." See *ibid.* (citing authorities describing such training).

Neither of these propositions tells us, however, that the same invasive mind-altering medication prescribed for mental illness is not also used in responding to mental retardation. And in fact, any apparent plausibility in the Court's suggestion that "the mentally retarded in general are not subjected to th[is] medical treatmen[t]," *ibid.,* dissipates the moment we examine readily available material on the subject, including studies of institutional practices affecting the retarded comparable to those studies concerning the treatment of mental illness cited by the Court. One recent examination of institutions for the mentally retarded in Kentucky's neighboring State of Missouri, for example, found that 76% of the institutionalized retarded receive some type of psychoactive drug and that fully 54% receive psychotropic drugs. See Intagliata & Rinck, Psychoactive Drug Use in Public and Community Residential Facilities for Mentally Retarded Persons, 21 Psychopharmacology Bull. 268, 272–

273 (1985). Another study, this one national in scope, found that 38% of the residents of institutions for the mentally retarded receive psychotropic drugs. See Hill, Balow, & Bruininks, A National Study of Prescribed Drugs in Institutions and Community Residential Facilities for Mentally Retarded People, 21 Psychopharmacology Bull. 279, 283 (1985). "Surveys conducted within institutions [for the mentally retarded] have generally shown prevalences in the range of 30% to 50% of residents receiving psychotropic drugs at any given time." Aman & Singh, Pharmacological Intervention, in Handbook of Mental Retardation 347, 348 (J. Matson & J. Mulick eds., 2d ed. 1991) (hereinafter Handbook of Mental Retardation).

Psychotropic drugs, according to the available material, are not only used to treat the institutionalized retarded, but are often misused. Indeed, the findings of fact by a United States District Court in North Carolina, another State nearby Kentucky, show that in three hospitals, 73% of persons committed as mentally retarded were receiving antipsychotic drugs. Less than half of these individuals had been diagnosed as mentally ill as well as mentally retarded following their commitment on the latter ground. See *Thomas S.* v. *Flaherty,* 699 F. Supp. 1178, 1187 (WDNC 1988), aff'd, 902 F. 2d 250 (CA4), cert. denied, 498 U. S. 951–952 (1990). The District Court found that the institutionalized retarded plaintiffs "have been seriously endangered and injured by the inappropriate use of antipsychotic drugs." *Flaherty, supra,* at 1186. See also *Halderman* v. *Pennhurst State School Hospital,* 446 F. Supp. 1295, 1307–1308 (ED Pa. 1977) (discussing evidence that 51% of the residents of a state institution for the mentally retarded received psychotropic drugs though less than one-third of those who received the drugs were monitored to determine the effectiveness of the treatment), aff'd, 612 F. 2d 84 (CA3 1979), rev'd on other grounds, 451 U. S. 1 (1981); Bates, Smeltzer, & Arnoczky, Appropriate and Inappropriate Use of Psychotherapeutic

Medications for Institutionalized Mentally Retarded Persons, 90 Am. J. Mental Deficiency 363 (1986) (finding that between 39% and 54% of medications prescribed to mentally retarded persons are inappropriate for the conditions diagnosed).

These facts are consistent with a law review study of drugs employed in treating retardation, which observed that the reduction in the need for institutional staff resulting from the use of sedating drugs has promoted drug use in responding to retardation despite "frightening adverse effects [including the suppression of] learning and intellectual development." Plotkin & Gill, Invisible Manacles: Drugging Mentally Retarded People, 31 Stan. L. Rev. 637, 638 (1979). There being nothing in the record to suggest that Kentucky's institutions are free from these practices, and no reason whatever to assume so, there simply is no plausible basis for the Court's assumption that the institutional response to mental retardation is in the main less intrusive in this way than treatment of mental illness.

The Court also suggests that medical treatment for the mentally retarded is less invasive than in the case of the mentally ill because the mentally ill are subjected to psychiatric treatment that may involve intrusive enquiries into the patient's innermost thoughts. See ante, at 324–325. Again, I do not disagree that the mentally ill are often subject to intrusive psychiatric therapy. But the mentally retarded too are subject to intrusive therapy, as the available material on the medical treatment of the mentally retarded demonstrates. The mentally retarded are often subjected to behavior modification therapy to correct, among other things, anxiety disorders, phobias, hyperactivity, and antisocial behavior, therapy that may include aversive conditioning as well as forced exposure to objects that trigger severe anxiety reactions. See McNally, Anxiety and Phobias, in Handbook of Mental Retardation 413–423; Mulick, Hammer, & Dura, Assessment and Management of Antisocial and Hyperactive Behavior, in

Handbook of Mental Retardation 397–412; Gardner, Use of Behavior Therapy with the Mentally Retarded, in Psychiatric Approaches to Mental Retardation 250–275 (F. Menolascino ed. 1970). Like drug therapy, psychiatric therapy for the mentally retarded can be, and has been, misused. In one recent case, a Federal District Court found that "aversive procedures [including seclusion and physical restraints were] being inappropriately used with no evidence for their effectiveness and no relationship between the choice of the procedure and the analysis of the cause of the problem[,] . . . plac[ing] clients at extreme risk for maltreatment." *Lelsz* v. *Kavanagh*, 673 F. Supp. 828, 850 (ND Tex.) (internal quotation marks and citation omitted), rev'd on unrelated grounds, 824 F. 2d 372 (CA5 1987). Invasive behavior therapy for the mentally retarded, finally, is often employed together with drug therapy. See McNally, *supra*, at 413–423; Mulick, Hammer, & Dura, *supra*, at 397–412.

The same sorts of published authorities on which the Court relies, in sum, refute the contention that "[t]he prevailing methods of treatment for the mentally retarded, as a general rule, are much less invasive than are those given the mentally ill." *Ante*, at 324.[6] The available literature indicates that psychotropic drugs and invasive therapy are routinely administered to the retarded as well as the mentally

---

[6] I also see little point in the Court's excursion into the historical difference in treatment between so-called "idiots," and so-called "lunatics." See *ante*, at 326. Surely the Court does not intend to suggest that the irrational and scientifically unsupported beliefs of pre-19th-century England can support any distinction in treatment between the mentally ill and the mentally retarded today. At that time, "lunatics" were "[s]een as demonically possessed or the products of parental sin [and] were often punished or left to perish." See S. Herr, Rights and Advocacy for Retarded People 9 (1983). The primary purpose of an adjudication of "idiocy" appears to have been to "depriv[e] [an individual] of [his] property and its profits." *Id.*, at 10. Those without wealth "were dealt with like other destitute or vagrant persons through workhouses and houses of correction." *Id.*, at 11.

ill, and there are no apparent differences of therapeutic regimes that would plausibly explain less rigorous commitment standards for those alleged to be mentally retarded than for those alleged to be mentally ill.[7]

## III

With respect to the involvement of family members and guardians in the commitment proceeding, the Court holds it to be justified by the fact that mental retardation "has its onset during a person's developmental period," while mental illness "may arise or manifest itself with suddenness only after minority." *Ante*, at 329. The Court suggests that a mentally ill person's parents may have "ceased to provide care and support" for him well before the onset of illness, whereas parents are more likely to have retained connection with a retarded son or daughter, whose "proper course of treatment" may depend on matters related to "observations made in a household setting." *Ibid.*

These suggested distinctions, if true, would apparently not apply to guardians, whose legal obligations to protect the persons and estates of their wards would seem to require as much connection to the one class of people as to the other.

---

[7] Petitioner also argues that mental retardation is different from most cases of mental illness in being a permanent condition that may require a lifetime of care. See Brief for Petitioner 31. But petitioner completely fails to explain how the permanence of the condition or the likely need of lifetime care can rationally justify a regime in which those alleged to require institutionalization based on mental retardation face a greater risk of erroneous curtailment of liberty than those who are alleged to require it based on mental illness. The distinction proffered by the State (accepting it to be factually accurate and not based merely on stereotype) cuts quite the other way. The possibility that a condition once thought to justify commitment will last a lifetime suggests that a person committed to an institution on the basis of mental retardation is less likely to regain his liberty than one institutionalized on some other basis. If this could rationally justify any disparity in commitment standards, it could only be in requiring stricter protection in mental retardation cases than in those based on mental illness, not the other way around.

In any event, although these differences might justify a scheme in which immediate relatives and guardians were automatically called as witnesses in cases seeking institutionalization on the basis of mental retardation,[8] they are completely unrelated to those aspects of the statute to which Doe objects: permitting these immediate relatives and guardians to be involved "as parties" so as to give them, among other things, the right to appeal as "adverse" a decision not to institutionalize the individual who is subject to the proceedings. Where the third party supports commitment, someone who is alleged to be retarded is faced not only with a second advocate for institutionalization, but with a second prosecutor with the capacity to call and cross-examine witnesses, to obtain expert testimony and to raise an appeal that might not otherwise be taken, whereas a person said to require commitment on the basis of mental illness is not. This is no mere theoretical difference, and my suggestion that relatives or guardians may support curtailment of liberty finds support in the record in this case. It indicates that of the 431 commitments to Kentucky's state-run institutions for the mentally retarded during a period between 1982 and the middle of 1985, all but one were achieved through the application or consent of family members or guardians. See Record, State's Answers to Plaintiff's First Set of Interrogatories 2, 17.

The Court simply points to no characteristic of mental retardation that could rationally justify imposing this burden of a second prosecutor on those alleged to be mentally retarded where the State has decided not to impose it upon those alleged to be mentally ill. Even if we assumed a generally more regular connection between the relatives and guardians of those alleged to be retarded than those said to

---

[8] Of course both guardians and relatives can already act as witnesses in each kind of proceeding subject only to the limitations of relevance and interest.

be mentally ill, it would not explain why the former should be subject to a second prosecutor when the latter are not.

The same may be said about the Court's second suggested justification, that the mentally ill may have a need for privacy not shown by the retarded. Even assuming the ill need some additional privacy, and that participation of others in the commitment proceeding should therefore be limited "to the smallest group compatible with due process," *ante,* at 329, why should the retarded be subject to a second prosecutor? The Court provides no answer.[9]

Without plausible justification, Kentucky is being allowed to draw a distinction that is difficult to see as resting on anything other than the stereotypical assumption that the retarded are "perpetual children," an assumption that has historically been taken to justify the disrespect and "grotesque mistreatment" to which the retarded have been subjected. See *Cleburne,* 473 U. S., at 454 (STEVENS, J., concurring) (internal quotation marks and citation omitted). As we said in *Cleburne,* the mentally retarded are not "all cut from the same pattern: . . . they range from those whose disability is not immediately evident to those who must be constantly cared for." *Id.,* at 442. In recent times, at least when imposing the responsibilities of citizenship, our jurisprudence has seemed to reject the analogy between mentally retarded adults and nondisabled children. See, *e. g., Penry* v. *Lynaugh,* 492 U. S. 302, 338 (1989) (controlling opinion of O'CONNOR, J.) (not "all mentally retarded people . . .— by virtue of their mental retardation alone, and apart from any individualized consideration of their personal responsibility—inevitably lack the cognitive, volitional, and moral capacity to act with the degree of culpability associated with the death penalty"); see also *id.,* at 340 ("reliance on mental

---

[9] I also note that the Court provides no support for its speculation that an adult who develops mental illness will have a greater need or desire for privacy in an involuntary commitment proceeding than an adult who is mentally retarded.

age to measure the capabilities of a retarded person for purposes of the Eighth Amendment could have a disempowering effect if applied in other areas of the law"). But cf. *ante*, at 331 (citing *Parham* v. *J. R.*, 442 U. S. 584 (1979), a case about parents' rights over their minor children). When the State of Kentucky sets up its respective schemes for institutionalization on the basis of mental illness and mental retardation, it too is obliged to reject that analogy, and to rest any difference in standards for involuntary commitment as between the ill and the retarded on some plausible reason.

## IV

In the absence of any rational justification for the disparate treatment here either with respect to the burdens of proof or the participation of third parties in institutionalization proceedings, I would affirm the judgment of the Court of Appeals. Because of my conclusion, that the statute violates equal protection, I do not reach the question of its validity under the Due Process Clause.