**PI LAMBDA PHI FRATERNITY, INC.,** a corporation with its principal place of business in Connecticut; Pa. Gamma Sigma Chapter of Pi Lambda Phi Fraternity, an unincorporated association of individuals; Pa. Gamma Sigma Alumni Chapter of Pi Lambda Phi Fraternity; Brad Zulick, Chad Crisp and Joshua Lang, individuals who are members of the Pa. Gamma Sigma Chapter of Pi Lambda Phi Fraternity; and Kevin Armour and Jon Miller, individuals who desire to join Pi Lambda Phi Fraternity, Plaintiffs,

v.

**UNIVERSITY OF PITTSBURGH,** Mark Nordenberg, individually and in his capacity as the Chancellor of the University; Robert Gallagher, individually and in his capacity as the Interim Vice–Chancellor for Student Affairs of the University of Pittsburgh; Dennis Donham, individually and in his capacity as Assistant Vice–Chancellor for Student Affairs of the University of Pittsburgh; Leon Haley, former Vice–Chancellor for Student Affairs of the University of Pittsburgh; Dan Cohen, individually and in his capacity as a Pittsburgh City Council member; City of Pittsburgh; Eloise Hirsh, individually and in her capacity as Director of Planning of the City of Pittsburgh, Defendants.

Civil Action No. 97–703.

United States District Court, W.D. Pennsylvania.

July 27, 1999.

Edward A. Olds, Pittsburgh, PA, for PI Lambda PHI Fraternity, Inc., PA Gamma Sigma Chapter of PI Lambda PHI fraternity, PA Gamma Sigma Alumni Chapter of PI Lambda PHI Fraternity, Brad Zulick, Chad Crisp, Joshua Lang, Kevin Armour, Jon Miller, Plaintiffs.

Pamina G. Ewing, Reed, Smith, Shaw & McClay, Susan L. Wormer, John G. Greeno, Pittsburgh, PA, for University of Pittsburgh, Mark Nordenberg, Robert Gallagher, Dennis Donham, Leon Haley, defendants.

George R. Specter, Deputy Solicitor, Jacqueline R. Morrow, City of Pittsburgh Dept. of Law, Pittsburgh, PA, for Dan Cohen, City of Pittsburgh, Eloise Hirsh, Defendants.

## OPINION

ZIEGLER, Chief Judge.

Pending before the court are the motions (doc. nos. 41 and 44) of defendants, the University of Pittsburgh, Mark Nordenberg, Robert Gallagher, Dennis Donham, Leon Haley (collectively "the university defendants"), Dan Cohen, the city of

Pittsburgh, and Eloise Hirsh (collectively "the city defendants"), for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

Plaintiffs, Pi Lambda Phi Fraternity, Inc., Pa Gamma Sigma Chapter of Pi Lambda Phi Fraternity, Pa Gamma Sigma Alumni Chapter of Pi Lambda Phi Fraternity, Brad Zulick, Chad Crisp, Joshua Lang, Kevin Armour and Jon Miller (the "fraternity"), commenced this civil action alleging violation of their civil rights pursuant to 42 U.S.C. § 1983. Specifically, the fraternity asserts claims under the First and Fourteenth Amendments for a violation of their rights to free association, equal protection, and substantive and procedural due process.

On April 16, 1999, the fraternity voluntarily dismissed the claims against the city defendants. *See* Doc. No. 50. The city defendants' summary judgment motion is therefore denied as moot. Plaintiffs also voluntarily dismissed the due process claims and the money damages claims against the university defendants. *Id.* Thus, we need only decide whether the university defendants are entitled to summary judgment on plaintiffs' free association and equal protection claims for declaratory relief under the First and Fourteenth Amendments. For the reasons that follow, we shall grant judgment for the university defendants on plaintiffs' remaining claims.

### FACTUAL BACKGROUND

This action arises out of disciplinary action taken by the university defendants after a police raid on the PA Gamma Sigma Chapter residence on April 30, 1996. Pittsburgh Police arrested four fraternity members and four other individuals for possession and/or distribution of drugs.

On May 3, 1996, the University and the fraternity's international office suspended the PA Gamma Sigma Chapter of the fraternity. On June 27, 1996, a panel of three Student Affairs officials of the University conducted a hearing, reviewing the April 30, 1996 incident. The panel made recom-

mendations to Dr. Dennis Donham, Assistant Vice Chancellor for Student Affairs. Dr. Donham suspended the fraternity for one year and requested that the fraternity comply with various sanctions, including, *inter alia,* that plaintiffs: (1) conduct a membership review and advise the University of those members who are certified; (2) arrange for an alumnus living in the area to assume the fraternity's management responsibilities; (3) arrange for a live-in graduate resident advisor, who would report to the University's Greek advisor; (4) implement a substance free environment; and (5) fully comply with the University's Greek rules. On July 26, 1996, Dr. Leon Haley, then Vice Chancellor of Student Affairs, affirmed Dr. Donham's sanctions and on August 22, 1996, Dr. Robert Gallagher, Interim Vice Chancellor for Student Affairs, also upheld the sanctions.

In November 1996, the fraternity sought relief from the sanctions. A hearing panel found that the fraternity had complied with Dr. Donham's requirements and recommended that the University reinstate the fraternity as a University recognized organization. On December 4, 1996, Dr. Gallagher rejected the panel's recommendation and continued the sanctions pending further review.

On February 27, 1997, a hearing panel of the University conducted another review of the fraternity. The panel recommended that the University fully recognize the fraternity beginning April 29, 1997.

On April 18, 1997, prior to a University ruling on the fraternity's reinstatement, plaintiffs filed a complaint and a motion for a temporary restraining order in this court. On April 24, 1997, the court denied the motion for injunctive relief.

On May 15, 1997, Dr. Gallagher notified the international fraternity office that the University would not recognize the fraternity as a University student organization. He further indicated that the international fraternity office could petition the Univer-

sity for certification some time after May 1998.

On October 21, 1997, Dr. Gallagher reaffirmed his indefinite suspension of the fraternity and noted that he had discovered a "Pi Lambda Phi Fall 1997 Rush Schedule" after receiving neighbor's complaints that the fraternity was hosting loud parties into the late evening/early morning hours. Gallagher further noted that "the Rush Schedule seriously jeopardizes any efforts the Fraternity may plan for recolonization." Univ. Defs.' App., Ex. 6.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, we must examine the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## DISCUSSION

### A. Applicable University Rules

The University's policy, as set forth in the Student Code of Conduct & Judicial Proceedings manual, states:

> An offense related to welfare, health, or safety is committed when a student: .... 3. Uses, possesses, distributes, sells, or is under the influence of narcotics, hallucinogenics, dangerous drugs, controlled substances except as permitted by law, or possesses paraphernalia which can be demonstrated to be linked to drug activity, such as bongs with residue. 4. Students who are knowingly present during the commission of the violation(s) of [the provisions of number three above] will be subject to disciplinary proceedings.

Defs.' Reply to Pls.' Opp'n to Summ.J., Ex. A, University of Pittsburgh Student Code of Conduct and Judicial Proceedings, p. 9.

Further, the university has a compilation of codes governing fraternity and sorority activity. The compilation of codes states that:

> Individual fraternity and sorority chapters which hold membership in the Interfraternity Council and Panhellenic Association and are recognized by the University of Pittsburgh are required to comply with the following standards: 1. Chapters shall not permit their individual members or their guests to engage in conduct prohibited in the aforementioned "Individual Fraternity Member Responsibilities". **Chapters shall be held accountable for actions of individual members and their guests.**

University of Pittsburgh Compilation of Codes Governing Fraternity and Sorority Activity II.1, Fraternity Chapter Responsibilities, Doc. Exs. to Pl.'s Resp. to Summ.J. (emphasis supplied). In addition, individual fraternity members "shall abide by all state and municipal laws and University policies." *Id.* at I.3.

### B. Free Association Claim

Plaintiffs assert that the university defendants have unlawfully infringed on their right to freedom of association protected by the First and Fourteenth Amendments to the United States Constitution. The university defendants seek summary judgment on this claim.

There are two types of association protected by the Constitution: (1) intimate association, based on intimate human relationships; and (2) associations formed "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). This second type of association has also been referred to as expressive association. *Id.* at 618, 622, 626, 104 S.Ct. 3244. The fraternity's association fails to fit within either type of protected association.

The personal relationships protected by the right to intimate association

are "those that attend the creation and sustenance of a family—marriage, ... the raising and education of children, ... and cohabitation with one's relatives." *Roberts*, 468 U.S. at 619–20, 104 S.Ct. 3244 (citations omitted). Clearly, plaintiffs are not engaged in the sort of intimate human relationships that give rise to First Amendment protection. *See, e.g., Dallas v. Stanglin*, 490 U.S. 19, 24, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989); *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546–47, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987); *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1204–05 (3d Cir. 1988) (association with brother-in-law not an intimate association entitled to protection).

▬ Next, we must determine whether the fraternity is an expressive association. The Supreme Court has held that "the First Amendment protects an individual's right to join groups and associate with others holding similar beliefs." *Dawson v. Delaware*, 503 U.S. 159, 163, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992).

We are doubtful that the fraternity is an association protected by the First Amendment. While the fraternity has several purposes, we find that the central purpose of the fraternity is social. *See, e.g., Cornelius v. Benevolent Protective Order of the Elks*, 382 F.Supp. 1182, 1195 (D.Conn. 1974) ("the associational activities of the Elks and Moose are purely social and not political and therefore do not come within the core protection of the right to associate."); *Sigma Chi Fraternity v. Regents of the Univ. of Colo.*, 258 F.Supp. 515, 526 (D.Colo.1966) (noting the lack of analogous Supreme Court precedent to "uphold the right of association as applied to a social fraternity."); *Phinney v. Dougherty*, 307 F.2d 357, 361 (5th Cir.1962) (for purposes of the internal revenue code, "college fraternities are primarily social clubs."). Therefore, we conclude that the fraternity, as a social association, does not enjoy protection under the First Amendment accorded to either intimate associations or expressive associations. *See generally Stanglin*, 490 U.S. at 25, 109 S.Ct. 1591 ("we do not think that the Constitution recognizes a generalized right of 'social association' that includes chance encounters in dance halls.").

▬ Even assuming that the fraternity is an expressive association cloaked with the First Amendment's protection, we find that the university defendant's refusal to recognize the fraternity survives heightened scrutiny. As noted by the Supreme Court in *Healy v. James*, the First Amendment protects advocacy not conduct:

> the critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not. Petitioners may, if they so choose, preach the propriety of amending or even doing away with any or all campus regulations. **They may not, however, undertake to flout these rules.**

408 U.S. 169, 192, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (emphasis added). The Court reaffirmed that universities may regulate student groups "with respect to the time, the place, and the manner in which student groups conduct their speech-related activities[,]" *id.* at 192–93, 92 S.Ct. 2338, **and may suspend or withdraw recognition of student groups who violate valid university rules.** *Id.* at 193 n. 24, 92 S.Ct. 2338.

Applying these teachings, we hold that the university defendants were entitled to regulate plaintiffs' conduct with respect to drug use and to withdraw university recognition of the fraternity due to the violation of university rules. *See id.* at 192–93, 92 S.Ct. 2338; *see also Widmar v. Vincent*, 454 U.S. 263, 277, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) ("we affirm the continuing validity of cases, e.g., *Healy v. James*, ... that recognize a University's right to **exclude even First Amendment activities that violate reasonable campus rules** or substantially interfere with the opportunity of other students to obtain an education.") (emphasis supplied). The

university defendants' withdrawal of recognition serves a compelling interest in maintaining a safe educational environment. *See generally Vernonia Sch. Dist. v. Acton,* 515 U.S. 646, 661, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (in the context of Fourth Amendment searches and seizures, "that ... the concern [drug use by school children] is important—indeed, perhaps compelling—can hardly be doubted."); *Sanitation and Recycling Indus., Inc. v. City of New York,* 107 F.3d 985, 998 (2d Cir.1997) ("We think it beyond question that the government has a compelling interest in combatting crime, corruption and racketeering—evils that eat away at the body politic."); *Trade Waste Mgmt. Ass'n, Inc. v. Hughey,* 780 F.2d 221, 238 (3d Cir.1985) ("the New Jersey interest in keeping the sensitive waste disposal business free from the influence of organized crime .... is compelling.").

Moreover, the regulation of the fraternity due to illegal drug activity is in no way connected to the fraternity's First Amendment activities. Therefore, the University's regulation is valid and constitutional. *See, e.g., Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 707, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986) (closure of book store due to prostitution activities does not violate First Amendment; bookselling will not immunize bookstore from punishment of unlawful activities on premises).

■ Furthermore, the university's withdrawal of recognition of the fraternity has had merely a slight effect on the fraternity's expressive association, as the fraternity has continued to associate in other ways: (1) it has continued to rush and has pledged new member; (2) members continue to reside in the fraternity's Dithridge Street residency; (3) the fraternity has hosted parties and other functions; and,

(4) the group has performed volunteer work. Although the fraternity may not participate in University and/or Greek events, this consideration alone does not work a First Amendment violation. There is no absolute right to use the school environment for First Amendment purposes, *Grayned v. City of Rockford,* 408 U.S. 104, 117–18, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (no absolute right to use school sidewalk for picketing); *Burrows v. Ohio High Sch. Athletic Ass'n,* 891 F.2d 122, 125–26 (6th Cir.1989) (no constitutional right to participate in interscholastic soccer), or to participate in university activities. *Karmanos v. Baker,* 816 F.2d 258, 260 (6th Cir.1987) (no constitutionally protected right to participate in NCAA hockey or intercollegiate athletics).

The withdrawal of recognition may seem oppressive to plaintiffs. However, we will not sit in place of the University and second guess whether the sanction was the most appropriate method of promoting the University's interest. *See, e.g., Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 299, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (judiciary should not replace National Park Service as the manager of the Nation's parks or second guess the decision to prevent demonstrators from sleeping on park lands); *Rosenfeld v. Ketter,* 820 F.2d 38, 41 (2d Cir.1987) (Court would not second-guess the University's decision to exclude suspended law student from campus as the most appropriate method of punishing the student and preventing further disruption). In sum, the university defendants' withdrawal of recognition of the fraternity serves a compelling government interest and justifies the comparatively minor effect on the First Amendment association rights of the fraternity.[1] In sum, we will grant judg-

---

1. To the extent that the fraternity complains that the University's fraternity rule imposes corporate responsibility on the fraternity for the conduct of only a few members, we find this argument without merit. As noted by the Supreme Court, "this argument proves too much, since every civil and criminal remedy imposes some conceivable burden on

First Amendment protected activities." *Arcara,* 478 U.S. at 705–06, 106 S.Ct. 3172. The incidental impact of the university defendants' withdrawal of recognition on the associational rights of the fraternity does not violate the First Amendment because the conduct punished bears little relation to the expressive conduct protected by the First

ment for the university defendants on the First Amendment claim.

## C.  Equal Protection Claim

■  Plaintiffs claim that the University's Compilation of Codes Governing Fraternity and Sorority Activity violates the Fourteenth Amendment's Equal Protection Clause because the code allegedly holds fraternities and sororities liable for the conduct of their members "even if the individual who violates the rule does so without the knowledge or consent of the Fraternity."  Pls.' Br. in Opp'n to Defs.' Mot. for Summ.J. at p. 28.  The university defendants seek to dismiss the equal protection claim arguing that the University does not treat fraternities differently than other student organizations and that, even assuming the University treats fraternities differently, there is a rational basis for doing so.

■  The Equal Protection Clause of the Fourteenth Amendment provides that the State shall not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV. The equal protection guarantee does not prohibit classifications.  *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992).  "It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  *Id.* (citation omitted); *see also Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

■  Generally speaking, when enacting legislation, the government is given great latitude in creating classifications, *Dyszel v. Marks,* 6 F.3d 116, 124 (3d Cir. 1993), and "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249 (citations omitted).  However, "[t]he

amount of deference shown to state-created categories varies according to the group discriminated against and the infringed upon right or interest."  *Dyszel,* 6 F.3d at 125.  When a statute classifies individuals by race, alienage or national origin, the statute is subject to strict scrutiny "and will be sustained only if [it is] suitably tailored to serve a compelling state interest."  *Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249 (citations omitted).  Statutes that classify individuals based upon sex, gender or illegitimacy must be substantially related to important government interests.  *Id.* at 441, 105 S.Ct. 3249.  Lastly, social and economic legislation is reviewed under the rational basis test.  *Id.* at 440, 105 S.Ct. 3249.

■  A classification not involving a suspect class is presumed constitutional and the burden rests with the party challenging legislation to negate any conceivable rational basis.  *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993).  In determining the rationality of a classification, "a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."  *Federal Communications Comm'n v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

First, we fail to see how the rule regarding corporate liability of the fraternity for individual members is different from the University's rules set forth in the Student Code of Conduct which govern all students.  Several sections of the Code of Conduct hold students accountable for actions of their visitors and/or guests.  Pursuant to the Student Code of Conduct, a student commits an offense when s/he "fails to control the behavior of a guest." Defs.' Reply to Pls.' Opp'n to Summ.J., Ex.

---

Amendment.  *Id.* at 707, 106 S.Ct. 3172.  Although the university defendants' withdrawal of recognition penalizes both the "bad apples" and the law abiding members of the fraternity, this result is justified by the uni-

versity defendants' compelling interest in maintaining a safe educational environment free of drug activity.  *Cf. Sanitation and Recycling Indus.,* 107 F.3d at 1000.

A, University of Pittsburgh Student Code of Conduct and Judicial Proceedings, p. 8. Furthermore, pursuant to the Visitation Policy, **"Residents will be accountable for rule infractions for all visitors/guests, including those signed in by the resident and those accompanied by the resident, as well as all visitors/guests within a resident's accommodation."** *Id.* at 11 (emphasis in original). In addition, pursuant to the alcohol policy, "Residents are absolutely responsible and legally accountable for their actions and the actions of their visitors, including any damages or injuries which result from their actions during or after the consumption of alcoholic beverages." *Id.* at 12. As there are no discernible differences between the fraternity rule and the general university rules, plaintiffs have failed to show how fraternities and sororities are treated differently than the rest of the student body. Therefore, plaintiffs have failed show an equal protection violation.

■ Even assuming that the University treats fraternities and sororities differently than other students or student groups, fraternities are not a protected class. As such, the University's rule regarding fraternities need only survive rational basis review. *Heller,* 509 U.S. at 320, 113 S.Ct. 2637; *see also Stanglin,* 490 U.S. at 25–26, 109 S.Ct. 1591.

There is a rational basis for treating fraternities and sororities differently than other students and/or student groups. As stated in the findings of fact:

> The University has many potential reasons to hold fraternities and sororities, which have a far more significant involvement in students' lives than do other student organizations, to different sets of rules for the conduct of their members. Fraternity and sorority members reside in fraternity and sorority houses. They take meals in the residence and engage in a vast array of social activities sponsored by fraternities and sororities and have for decades been involved in these functions, including hazing traditions which provide a rational basis for the University to hold fraternities and sororities to different standards than the University may apply to other student organizations such as student government or other such clubs.

Findings of Fact, Doc. No. 10, pp. 8–9. Indeed, unlike other student groups, fraternity and sorority members often live in the same house together, inductees undergo an intense "rush" and/or pledging period, and fraternities and sororities frequently serve alcohol at social functions.

The University, in enacting the rule, could quite reasonably have concluded that requiring corporate responsibility for the conduct of individual fraternity members would promote safety on campus and would provide a safer educational environment for students. For these reasons, the compilation of codes and specifically the rule regarding fraternity responsibility for the conduct of individual members serve a rational purpose in providing a safe educational environment for all students. Therefore, the classification does not violate the Equal Protection Clause. *See generally Central State Univ. v. American Ass'n of Univ. Professors,* —— U.S. ——, 119 S.Ct. 1162, 1163–64, 143 L.Ed.2d 227 (1999) (per curiam).

### CONCLUSION

We shall grant the university defendants' motion for summary judgment and deny the city defendants' motion for summary judgment as moot. An appropriate order will follow.

### ORDER

AND NOW, this 27th day of July, 1999, after consideration of the motions (doc. nos. 41 and 44) of defendants for summary judgment, and the parties' submissions in support thereof,

IT IS ORDERED that the university defendants' motion (doc. no. 41) for summary judgment shall be and hereby is granted.

IT IS FURTHER ORDERED that the city defendants, the City of Pittsburgh,

Dan Cohen, and Eloise Hirsh, shall be and hereby are dismissed.

IT IS FINALLY ORDERED that the city defendants' motion (doc. no. 44) for summary judgment shall be and hereby is denied as moot.