

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-31-2000

# Gould Inc v. A&M Battery

Precedential or Non-Precedential:

Docket 99-3294

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Gould Inc v. A&M Battery" (2000). *2000 Decisions.* Paper 229.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/229

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 31, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3294

GOULD INC.

v.

A & M BATTERY & TIRE SERVICE; ALBER T NIVERT &
CO.; ALEXANDRIA SCRAP CORPORATION; BEN
WEITSMAN & SON, INC. OF OSWEGO, NY; ALL STA TE
METAL COMPANY; AMERICAN SCRAP CO.; AMSOURCE
(PENN IRON & METAL); B. MILLENS & SONS, INC.;
BARNEY SNYDER, INC.; BRISTOL METAL CO., INC.;
BROCK'S SCRAP & SALVAGE; BROOKFIELD AUTO
WRECKERS, INC.; BROOKFIELD METAL CO.; BUFFERED
JUNK CO.; CAPITOL IRON & STEEL CO., INC.; CAPITOL
SCRAP IRON & METALS; CHARLES BLUESTONE CO.,
INC.; CLAREMONT METAL & PAPER STOCK; CLINTON
METAL CO.; COMMERCIAL IRON & METAL CO.;
CONSERVIT, INC.; COOPER METALLURGICAL CORP.;
COUSINS METAL; CRESTWOOD METAL CORP .; DAVIS
BROS. SCRAP CO., INC.; DAVIS INDUSTRIES; ELMAN
RECYCLING CO.; EMPIRE RECYCLING CORP.; EXETER
METALS CO.; F. SCHANERMAN; FAIRFIELD SCRAP CO.;
FREDERICK JUNK CO.; FULTON IRON & STEEL CO.;
GARBOSE METAL; GELB & CO., INC.; GIORDANO
WASTE MATERIAL CO., in its own capacity and as the
successor to Halpern Metals Company; GREENBLOTT
METAL CO., INC.; GUTTERMAN IRON & METAL CORP.;
H. & D. METAL CO.; H. SHAKESPEARE & SONS, INC.;
HARRY GOLDBERG & SONS; HURWITZ BROS. IRON &
METAL CO.; I. SHULMAN & SON CO., INC.; I. SOLOMON
METAL CO., INC.; INDEPENDENT IRON & MET AL;
INTERSTATE BURLAP & BAG CO.; ITHACA SCRAP
PROCESSORS; J & J METALS, INC.; J. BROOMFIELD &
SON, INC.; J. SEPENUK & SONS, INC.; JAMES
BURROWS COMPANY, INC.; JOE KRENTZMAN & SONS;

JOSEPH FREEDMAN CO., INC.; JOSH STEEL CO.; KELLEHER BATTERY; KLEIN METAL CO., INC.; KLIONSKY SCRAP IRON & METAL CO.; LAKE ERIE RECYCLING; LARAMI METAL CO.; LIBERTY IRON & METAL CO., INC.; LOUIS COHEN & SON, INC.; LOUIS KUTZ & SON; LYELL METAL; M. HARTMAN, CO.; MARLEY'S DIVISION OF ABE COOPER, Liverpool, NY; MAXNOR META/M. SCHIPPER & SON; MEYER-SABA METAL, CO.; MID-CITY SCRAP IRON & SALV AGE, CO., INC.; MODERN JUNK & SALVAGE, CO.; MONTGOMERY IRON & METAL CO.; MORGAN HIGHWAY AUTO PARTS; NEWBURGH SCRAP CO.; OLEAN STEEL SALES & SERVICE; P. JACOBSON, INC.; P. K. SCRAP METAL CO.; PASCAP CO., INC.; PENN HARRIS METALS CORP .; PENN JERSEY RUBBER & WASTE CO.; R & R SALV AGE INC.; R. L. POETH SCRAPYARD; RIEGEL SCRAP & SAL VAGE; ROTH BROTHERS SMELTING CORP.; ROTH STEEL CORPORATION; S & J GENERATORS & ST ARTER CO.; S. KASOWITZ & SONS, INC.; SAM KAUFMAN & SON METALS CO.; SEGAL & SONS, INC.; SQUARE DEAL METAL RECYCLING; STATE LINE SCRAP CO., INC.; SUISMAN & BLUMENTHAL; TIMPSON SALVAGE CO.; TWIN CITIES WASTE & METAL; UNITED MET AL TRADERS, INC.; V. VACCARO SCRAP CO.; W ALDORF METAL CO.; WALLACE STEEL, INC.; WEINER BROKERAGE CORP.; WEINER IRON & METAL CORP.; WEINSTEIN & CO.; WILLIAM F. SULLIVAN & CO.; WIMCO METALS, INC.; JOINT DEFENSE GROUP; PETTINELI USED AUTO PARTS; DE MICROMIS GROUP; MARJOL SITE RETAILERS' JOINT DEFESNE GROUP; MICRO GROUP; WHITE & WILLIAMS DEFENSE GROUP; MARJOL SITE DE MINIMUS SCRAPDEALERS GROUP; MARJOL SITE PRP GROUP; EXXON, INC.; BODOW RECYCLING CO.; KASSAB BROTHERS STEEL; CHARLES MEYER & SON; ALLAN INDUSTRIES; ATTONITO RECYCLING CORPORATION; CRASH'S AUTO PARTS & AUTO SALES/CAP SURPLUS SCRAP METAL; CHARLES EFFRON; CHAUNCEY SCRAP METALS; COATSVILLE SCRAP; H. BIXON & SONS SCRAP & METAL; DA VIS INDUSTRIES OF ARLINGTON, VA;

FRANK H. NOTT, INC.; G. CARLOMANGO, INC.; GEORGE MARS MKM BUILDERS; HUDSON SCRAP CO.; JACOBSON METAL CO.; ENOS METALS; KREIGER WASTE; FIEGLEMAN RECYCLING CO.; LOUIS MACK & CO. SCRAP METAL; LUKENS METAL CO.; M & M SCRAP METAL CO.; M. LEVENSON CO., INC.; MARSON MET ALS, INC.; N. BANTIVOLGLIO SONS PAPER & MET ALS, INC.; NORWITZ, INC.; P. LEWIS & SONS; P ATCHOGUE SHEET METAL SHOP; RICHARDSON GRAPHICS; BLADENSBURG/RIVER ROAD METALS CO.; ST. MARY'S IRON & STEEL CORP.; ZUCKERMAN SCRAP CO., INC.; KEARNEY SCRAP CO.; MARLEY'S DIVISION OF ABE COOPER; RIVERSIDE IRON & STEEL CORP.; A. ALLAN INDUSTRIES, INC., t/a Allan Industries; A. SHAPIRO & SONS; ABE COOPER SYRACUSE; ABE COOPER–WATERTOWN CORP.; ABE E. NATHAN & SONS; ABE N. SOLOMON, INC.; ACADEMY IRON & METAL CO.; ACME METALS & RECYCLING, INC.; ACTION MET AL COMPANY, INC.; ADVANCE AUTO STORES; AMERICAN BAG & METAL CO., INC.; AMERICAN SCRAP & W ASTE REMOVAL CO.; AMERICAN SCRAP PROCESSING, INC., d/b/a Riverside Iron & Steel; ANNADALE SCRAP COMPANY; ANNE PIRCHESKY, former shareholder of Eric's Iron & Steel Corp., a dissolved corporation f/d/b/a Riverside Iron & Steel Corp.; ARCHBALD WRECKING CO.; ATLANTIC BATTERY CORPORATION; B. ZEFF COMPANY, INC.; N. BANTIVOLGLIO METALS, INC., renamed as Bantivoglio Metal Company a/k/a Bantivolgio Metals and f/k/a N. Bantivoglio's Sons, Inc.; BEAVER SMELTING AND REFINING CORP.; BLADENSBURG RIVER ROAD METALS COMPANY, INC.; CAMBRIDGE IRON AND METAL CO., INC.; CAPITOL SCRAPYARD; CASH AUTOMOTIVE PARTS; CHAPIN & FAGIN DIVISION OF GCF INC.; CHARLES MEYERS & SONS; CHAUNCEY METAL PROCESSORS, INC.; CLIMAX MANUFACTURING COMPANY, a/k/a Spevak's Waste Material Company; COATESVILLE SCRAP IRON & METAL CO., INC.; COLONIAL METALS; CONTINENTAL METALS CORPORATION; CROPSEY SCRAP IRON AND METAL;

3

D. KATZ & SONS, INC.; DANIELS & MILLER, INC.;
DECKER BROTHERS, INC.; DENAPLES AUTO PARTS;
DENVER CONSTRUCTION CORP., f/d/b/a Lukens Metal
Co.; DOUGLAS BATTERY MFG., INC.; E. EFFRON & SON;
EISNER BROTHERS; ERIC'S IRON & STEEL
CORPORATION, f/k/a Riverside Iron & Steel Corp; ERIC
PIRCHESKY, former shareholder of Eric's Iron & Steel
Corp., a dissolved corporation f/d/b/a Riverside Ir on &
Steel Corp.; FRANCIS WHITE SCRAP IRON & METAL;
GLICK IRON & METAL CO., INC.; G. CARLOMAGNO
SCRAP; G.M. HONKUS & SONS, INC.; GENERAL
BATTERY CORP.; GENERAL MET ALS & SMELTING CO.;
GEORGE MOSS; HARRY KAUFMAN; GORDON STEEL
CO.; GORDON WASTE CO.; H&B METAL CO., INC.;
HAROLD STRAUSS, in his own capacity and as
distributee of the assets of Denver Construction
Corporation f/d/b/a Lukens Metal Co.; HARRY'S
SCRAPYARD; HUDSON SCRAP METAL, INC.; I. KRAMER
AND SONS, INC.; I. RICHMOND & COMPANY, INC.;
INDUSTRIAL & MILL SUPPLIERS, INC.; IRVING RUBBER
& METAL COMPANY; J.C. PENNEY COMP ANY, INC.;
JACOB SHER, f/d/b/a Hudson Scrap; JEM METAL, INC.;
JULIAN C. COHEN SALVAGE CO.; K MAR T CORP.;
KASMAR METALS, INC.; KASSAB BROS.; KEARNY SCRAP
CO.; KREIGER WASTE PAPER CO.; LANCASTER BATTERY
CO., INC.; LANCASTER IRON & METAL CO., INC., a
former division of Lancaster Steel Co., Inc.; LEVENE'S
SON, INC.; LEVINE'S IRON & METAL, INC.; LEWIS
RAPHAELSON & SON, INC.; LONI-JO METALS, f/t/a
Attonito Recycling Corporation; LOUIS FIEGLEMAN &
CO.; LOUIS LEVIN & CO., INC.; LOUIS MACK CO., INC.;
LUKENS METAL CORP., d/b/a Lukens Metal Co.; M&M
SCRAP CORPORATION; M&P SCRAP IRON & MET AL
CORP.; M.C. CANFIELD SONS, f/k/a and f/t/a Lukens
Metal Corp.; M.H. BRENNER'S INC.; M. BURNSTEIN AND
COMPANY, INC.; M. ROSENBERG & SON, INC.; M.
WILDER & SON, INCORPORATED; METAL BANK OF
AMERICA; NOLTS AUTO PARTS, /Nolt's Factory
Warehouse; NORFOLK RECYCLING CORPORA TION;
NORTHEAST INDUSTRIAL BATTERIES, INC.; NOTT
ENTERPRISES, INC., f/k/a Frank H. Nott, Inc.;

4

NOVEY METAL CO.; PAVONIA SCRAP IRON & METAL COMPANY, INC.; PEDDLERS JUNK CO.; PERLMAN & SONS; PHILIP LEWIS & SONS; RIVER ROAD PRODUCTS, INC.; ROSEN BROTHERS; S. KLEIN METALS CO., INC.; S. ROME & CO., INC.; S.E.L. METAL CORPORA TION; ST. MARY'S AUTO WRECKERS; SAMUEL GORDON & SONS, INC.; SCHIAVONE & SON, INC.; renamed as Schiavone Corp.; SCHILBERG INTERGRATED METALS, INC., f/d/b/a Schilberg Iron & Metal Co., Inc.; SEABOARD SALVAGE; SITKIN METAL TRADING, INC.; STIKIN SMELTING & REFINING, INC.; SMITH IRON & MET AL CO.; SOLA METAL; SONE' ALLOYS, INC., d/b/a Enos Metals; STAGER WRECKING CO.; STAIMAN INDUSTRIES, INC.; SYRACUSE MATERIALS RECOVERY CORP .; TED SCHWEEN; TEPLITZ'S MIDDLETOWN SCRAP, f/t/a Middletown Scrap Iron, Inc.; THE BEST BA TTERY COMPANY, INC.; TOWANDA IRON & METAL, INC.; UNION CORPORATION, f/t/a Jacobson Metal Co.; UNITED HOLDING CO., INC., a/k/a United Iron & Metal Company, Inc.; UNITED SCRAP IRON & METAL CO.; USA; UNIVERSAL WASTE, INC.; VINCENT A. P ACE SCRAP METALS; VIRGINIA IRON & METAL COMP ANY, INC., renamed as Virginia Ir on & Metal Company of Portsmouth, Inc.; VIRGINIA SCRAP IRON & METAL CO., INC.; WILLIAM R. SULLENBERGER CO.; WILSON BATTERY COMPANY, renamed as Wilson Battery & Oil Company; WM. PORT'S SONS, INC.; ZUCKERMAN COMPANY, INC.; ZUCKERMAN STEEL COMP ANY, INC.; MEADVILLE METAL COMPANY; S. KAPLAN & SONS; BATAVIA WASTE MATERIAL CO., INC.; BATTERY MARKETING CORPORATION (BMC); BRIDGEPORT AUTO PARTS, INC. f/d/b/a GREAT LAKES BA TTERY; BUFF & BUFF, INC.; CAL'S AUTO SERVICE, INC.; CHEMUNG SUPPLY CORP., d/b/a Otsego Iron & Metal; CHEVRON CORPORATION, f/t/a Gulf Tire & Supply Co.; CHIDNESE SCRAP METAL; CORNING MATERIALS, INC.; EXIDE CORP., f/t/a Bay State Battery and Mid-Atlantic Distributors; THE GOODYEAR TIRE & RUBBER

5

COMPANY, f/t/a Ameron Auto Centers; HODES
INDUSTRIES, INC.; J. SAX & CO.; JOHN BRUNSES &
SON; KOVALCHICK SALVAGE CO.; MAX BROCK CO.,
INC.; MICHIGAN LEAD BATTERY CO.; MORRIS J.
RADOV, f/d/b/a Meadville Waste Company; N.
BANTIVOLGLIO'S SONS, INC., a/k/a Bantivolglio
Investment Co.; NEW CASTLE JUNK; PETTINELLI IRON &
METAL; QUALITY STORES, INC., d/b/a Quality Far m &
Fleet; SAM KASSAB; SHELL OIL CO., INC.; TEXTRON,
INC.; UNIVERSAL COOPERATIVES, INC.; WESTERN AUTO
SUPPLY CO.; WM. KUGLER & BROS., INC., WORCESTER
METAL & BATTERY; YATES BATTERY CO.; FEDERAL
GOVERNMENT GROUP; THE FIEGLEMAN GROUP;
NAPORANO IRON & METAL CO.; PHILIP MAY CO.

v.

MODERN JUNK & SALVAGE CO.; ALEXANDRIA SCRAP
CORPORATION; BRISTOL METAL CO., INC., HUDSON
SCRAP METAL, INC.; JACOB SHER; BLADENSBURG
RIVER ROAD METALS COMPANY, INC.; JOINT DEFENSE
GROUP; WIMCO METALS, INC.,
  Third Party Plaintiffs

v.

PHILLIP A. WEINSTEIN; ESTATE OF JOSEPH WEINSTEIN;
LAWRENCE FIEGLEMAN; UNITED STATES AIR FORCE;
UNITED STATES DEPARTMENT OF THE NAVY;
DEPARTMENT OF DEFENSE; UNITED ST ATES
DEPARTMENT OF THE ARMY; RICHARD B. CHENEY (in
his capacity as Secretary of Defense); H. LA WRENCE
GARRETT, III (in his capacity as Secr etary of the Navy);
DONALD B. RICE (in his capacity as Secretary of the Air
Force); MICHAEL P.W. STONE (in his capacity as
Secretary of the Army); DEFENSE REUTILIZA TION AND
MARKETING SERVICE; JOHN STEWART , COLONEL (in
his capacity as the Director of the Defense Reutilization
and Marketing Service); UNITED STATES DEFENSE
LOGISTICS AGENCY; CHARLES MCCLAUSAND, GENERAL
(in his capacity as head of the Defense Logistics Agency);
RAY ATKINSON; BUFF & BUFF, INC.;

6

BURLINGTON WASTE & METAL; CAPITOL BAG & WASTE
CO., INC.; CAPITOL SCRAP METAL CO.; RAY
CARDAMONE; R. COHEN & SON OF GLENS FALLS, INC.;
ROBERT DAVIS; EASCO WAREHOUSE; FERRO SCRAP
IRON & METAL, INC.; I. FIGELMAN & SON; S.
GARBOWITZ & SON, INC.; ARNOLD GROWICK; NATHAN
H. KELMAN, INC.; NATHAN'S WASTE & P APER STOCK
CO., INC.; NEW YORK TELEPHONE COMPANY; ONT ARIO
SCRAP METAL INC.; LOUIS PERLMAN & SONS, INC.; T .A.
PREDEL & CO., INC.; SAM T. ROSEN, INC., for merly
known as Otsego Iron & Metal Corporation; V ALLEY
STEEL, INC.; WILLIAM ANSETT WASTE CO., INC.; ZEKE'S
ENTERPRISES; LARRY TEITEL; TFCFINANCIAL
CORPORATION; JOHN DOE; JANE DOE; LAWRENCE
FIEGLEMAN; JOSEPH FIEGLEMAN; MARC A. ROBIN;
ANTHONY BONADIO; JOHN DELEO; JOSEPH STRAUB;
ROBERT MCANDREW; WILLIAM SULLENBERGER; M.N.
ADELSON & SONS, INC.; M. BERKOWITZ & COMPANY ,
INC.; GEORGE BERMAN & SON, INC.; JAMES BURROWS
COMPANY; PETER CLAIM; P.J. GRECO & SON, INC.;
JOE'S JUNK COMPANY; MEADVILLE METAL COMP ANY;
MENZOCK SCRAP COMPANY; MILLER ROOT & FUR
COMPANY; BERNARD PIRCHESKY; OSCAR PLATT; MAX
SILVER & SONS; BARNEY SNYDER OF OHIO, INC.,
        Third Party Defendants

American Scrap Company; Lake Erie Recycling;
Alexandria Scrap Corporation; R&R Salvage, Inc.,
        Appellants

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(D.C. No. 91-cv-01714)
District Judge: The Honorable Richard P . Conaboy

ARGUED July 19, 2000

BEFORE: SLOVITER, NYGAARD, and FUENTES,
Circuit Judges.

(Filed October 31, 2000)

        Donald B. Mitchell, Jr., Esq.
          (Argued)
        Rachel G. Lattimore, Esq.
        Arent, Fox, Kintner, Plotkin & Kahn
        1050 Connecticut Avenue, N.W.
        Washington, DC 20036-5339
          Attorneys for Appellants

        Dennis R. Suplee, Esq. (Argued)
        Schnader, Harrison, Segal & Lewis
        1600 Market Street, Suite 3600
        Philadelphia, PA 19103

        John M. Armstrong, Esq.
        Schnader, Harrison, Segal & Lewis
        220 Lake Drive East, Suite 200
        Cherry Hill, NJ 08002-1165
          Attorneys for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge.

This case arises from a contribution action initiated by appellee, Gould, Inc., under S 113 of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. S 9613. Appellants, Alexandria Scrap Corporation, R&R Salvage Company, Lake Erie Recycling, and American Scrap Company, appeal from several District Court orders in favor of Gould. Although appellants denied liability on several bases below, the sole issue they raise on appeal is whether the post-judgment enactment of the Superfund Recycling Equity Act, Pub. L. No. 106-113, 113 Stat. 1536 (November 29, 1999), requires r eversal of the judgments entered against them. We conclude that it does, and will, therefore, vacate the judgment of the District Court, and remand the cause for further pr oceedings.

I. Background Facts

From 1961 to 1980, the Marjol Battery and Equipment Company operated a battery breaking (i.e., r ecycling) facility

8

in the Borough of Throop, Lackawana County, Pennsylvania. Appellants, all scrap metal dealers, each sold spent lead-acid batteries to Marjol during the 1960s and 1970s for recycling. One appellant, Alexandria Scrap Corporation, also sold non-battery, or "soft" lead to Marjol.

The lead-acid battery recycling process is referred to as "breaking" because it literally r equires the recycler to break open the battery's outer casing and remove its lead and other recyclable components. Until the 1970s, the battery casings themselves, which were then made of har d rubber, were not recyclable. As a consequence, the casings were simply discarded, often contaminated with various amounts of residual lead and other toxic substances. Each of the appellants, like all of Marjol's suppliers at the time, sold spent lead-acid batteries to Marjol manufactur ed with hard rubber casings. The vast majority, if not all, of such casings were eventually dumped into old mine shafts located on Marjol's property, or otherwise buried on site.

Beginning in the late 1970s, battery manufactur ers began producing lead-acid batteries with casings made of polypropylene plastic rather than rubber . Eventually, battery recyclers such as Marjol found ways to recycle the plastic casings as well as other components fr om spent batteries. While trying to develop processes for recycling the plastic casings, however, Marjol simply stockpiled innumerable, broken, plastic casings on its pr operty. Like their hard rubber predecessors, these plastic casings were contaminated with lead and other toxic substances, and Marjol made virtually no effort to keep those substances from migrating through the environment.

As early as the 1960s, the Pennsylvania Department of Environmental Resources ("DER") began receiving complaints about emissions from the Marjol site. There is no question that Marjol's operations contaminated both its own property and its neighbors'. At the time, however, environmental law was largely undeveloped, and enforcement was generally lax.

On March 7, 1967, the DER's Bureau of Air Pollution Control entered an order requiring Marjol to reduce emissions from its site to the point that no emissions would

9

be detectable beyond its property line. Marjol repeatedly violated that order, first by failing to install the necessary equipment, and then by rendering it ineffective because it had slowed the speed of battery processing. Between 1975 and 1977, the DER issued a cease operations request that Marjol refused, and several remedial orders that it generally ignored.

In early 1980, Gould, Inc., of Ohio, agreed to acquire Marjol. When the DER learned of the planned acquisition, it conducted further investigations at the Marjol site and ultimately issued an "end of the line" order. That order essentially required Marjol to comply with the DER's remedial demands or cease operations. Gould, which was generally aware of Marjol's history with the DER, went ahead with the acquisition, and initiated measures to comply with the DER's remedial demands. Ultimately, however, Gould agreed to shut down the Marjol site.

Thereafter, the DER advised Gould that no further remediation of the Marjol site would be required, and no further enforcement actions taken, unless battery-breaking operations resumed. Gould performed various forms of maintenance and "housekeeping" at the Marjol site, but otherwise generally conducted no activities there. Later, the federal Environmental Protection Agency ("EPA") initiated investigations of the Marjol site, ultimately determining "that hazardous substances had been released, and that there was an `imminent and substantial endangerment' to the public health, welfare, or the environment." Appellee's Br. at 5-6.

II. Procedural History

In April 1988, Gould entered into a Consent Agreement and Order with the EPA under S 106(a) of CERCLA, 42 U.S.C. S 9606. That agreement required Gould to conduct site stabilization activities relating to lead and other hazardous substances at and around the Marjol site. In May 1990, Gould entered into a second consent order, this time with both the EPA and the Pennsylvania DER. This second order under the Resource Conservation and Recovery Act, 42 U.S.C. S 6928(h), required Gould to

10

perform a Facility Investigation and Corrective Measure Study at the Marjol site.

In December 1991, Gould initiated a civil action seeking cost recovery from approximately 240 Potentially Responsible Parties ("PRP's") pursuant to S 107(a)(4)(B) of CERCLA, or, alternatively, contribution pursuant to S 113. The defendants moved for partial summary judgment, arguing that because Gould was a responsible party who had entered into a consent agreement r esolving its liability to the government, it was limited to asserting a contribution claim only. The District Court agr eed, and granted partial summary judgment in favor of the defendants. See Gould, Inc. v. A&M Battery & T ire Serv., 901 F. Supp. 906, 910 (M.D. Pa. 1995).

The District Court held a bench trial on the issue of allocating response costs among those defendants held liable to Gould for contribution and held "that Gould should bear 75% of the clean-up costs and that the Defendants should bear the remaining 25% . . . ." Gould, Inc. v. A&M Battery & Tire Serv., 987 F. Supp. 353, 372 (M.D. Pa. 1997). The court then apportioned the defendants' 25% share according to the amount of waste each contributed to the Marjol site. See id.

With the exception of the four appellants, Gould eventually settled with all defendants. After appellants filed their notice of appeal, Congress passed, and the President signed, the Superfund Recycling Equity Act . Appellants are pursuing only their claim that this Act shields them from contribution liability to Gould. Gould counters that the Act does not apply to materials that contain non-r ecyclable components, that it does not apply retr oactively to this case, and that if it does apply retroactively, it violates the Fifth Amendment's due process guarantee.

III. Background Law

Under CERCLA:

> Notwithstanding any other provision or rule of law, and
> subject only to the defenses set forth in subsection (b)
> of [42 U.S.C. S 9607] --

11

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person, [shall be liable for]

(A) all costs of removal or remedial act ion incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response inc urred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the r easonable costs of assessing such injury, destruction, or loss r esulting from such a release; and

(D) the costs of any health assessment or health e ffects study carried out under [42 U.S.C. S 9604(i)].

42 U.S.C. S 9607(a).

After failing to pass several earlier versions, Congress passed, and on November 29, 1999, the President signed into law, the Superfund Recycling Equity Act, Pub. L. No. 106-113, Div. B, S 1000(a)(9) [S. 1948, T itle VII, 6001(b)(1)], 113 Stat. 1536 (November 29, 1999). The Act, intended to clarify liability under CERCLA, provides that a person who meets certain specified criteria, and "who arranged for recycling of a recyclable material shall not be liable under sections 9607(a)(3) and 9607(a)(4) of [42 U.S.C.] with respect to such material." 42 U.S.C. S 9627(a)(1). The Act defines a "recyclable material" to include, inter alia, "spent lead-acid, spent nickel-cadmium, and other spent batteries . . . ." Id. S 9627(b).

In transactions involving spent lead-acid batteries, the transaction:

shall be deemed to be arranging for recycling if the person who arranged for the transaction (by selling recyclable material or otherwise arranging for the recycling of recyclable material) can demonstrate by a preponderance of the evidence that at the time of the transaction--

12

> (1) the person met the criteria set forth in[S 9627(c)]
> with respect to the spent lead-acid batteries; and
>
> (2)(A) [t]he person was in compliance with a pplicable
> Federal environmental regulations or standards, and
> any amendments thereto, regarding the storage,
> transport, management, or other activities associated
> with the recycling of spent lead-acid batteries[.]"

Id. S 9627(e)(1) & (2)(A).

Although the Act does contain several exclusions, see id.
S 9627(f), only one is at issue here. Mor e a limitation than
an exclusion, S 9627(i) provides that the recycling
exemptions established by the Act "shall not af fect any
concluded judicial or administrative action or any pending
judicial action initiated by the United States  prior to
[November 29, 1999]." (emphasis added).

IV. Discussion

A. Retroactivity

By its express language, the Act has no ef fect on "any
concluded judicial or administrative action or any pending
judicial action initiated by the United States prior" to its
enactment. 42 U.S.C. S 9627(i). This section exempts two
categories of action from retroactive application of the Act.
One category exempts all actions concluded as of November
29, 1999, whether administrative or judicial in nature. The
second category exempts pending actions initiated by the
United States prior to November 29, 1999, but only if they
are judicial in nature. By implication or negative inference,
then, Congress intended the Act to apply r etroactively to all
other types of actions. One District Court case, Morton Int'l
Inc. v. A.E. Staley Mfg. Co., 2000 WL 1038176, at *9 (D.
N.J. July 19, 2000) has held that the language of the Act
reflects Congress' intent that the r ecycling exemption apply
to pending private party actions, thus applying retroactively
to, inter alia, judicial and administrative actions that were:
(1) initiated prior to November 29, 1999; (2) initiated by a
party other than the United States; and (3) still pending as
of November 29, 1999. We agree. This case is a judicial

13

action, initiated by a private party, and was pending on appeal as of November 29, 1999.

Gould argues that whenever a private party initiates a judicial action following a related federal administrative action, the causal link between the two requir es the court to deem the judicial action to have been initiated by the United States. Gould's proffered construction of S 9627(i) is belied not only by the Act's plain language, but also by its legislative history. Beginning in 1994, legislators introduced, and the two houses of Congr ess considered, various versions of the Act before finally succeeding in passing it in November 1999. See, e.g. , 145 Cong. Rec. S10391-01, S10433 (August 5, 1999) ("The language of this bill is the culmination of a process that we have been working on since the 103rd Congress."). Though broadly supported, congressional approval eluded the Act for several years because it was attached to lar ger, and far more controversial, attempts to refor m CERCLA as a whole.

As a consequence of its protracted gestation, much of the Act's relevant legislative history was cr eated in connection with its failed predecessors. Nevertheless, the history of prior bills is not entirely irrelevant to our interpretation of their enacted successors. In the case of the Super fund Recycling Equity Act, the history associated with prior versions is all the more relevant because the proposed statutory language, as well as the intent of its drafters, remained consistent throughout the pr otracted effort to pass it.

The 106th Congress passed the Act as part of an omnibus legislation package approved near the end of its 1999 Session. See Consolidated Appropriations Act, 2000, 106-113, 113 Stat. 1501, 1501A-598 (November 29, 1999). The version of the Act ultimately enacted was first introduced as a stand-alone bill in the Senate, see S. 1528, reprinted in 145 Cong. Rec. S10391-01, S10432 (August 5, 1999), which ultimately attached it to a lar ger bill pending before that legislative chamber. See  S. 1948, as enacted at 113 Stat. 1501A-521. During discussions of that lar ger bill, Senator Lott obtained unanimous consent to insert the

14

Act's legislative history into the recor d. See 145 Cong. Rec.
S14986–03, S15048 (November 19, 1999).1

According to that history, the Act "pr ovides for relief from
liability for both retroactive and pr ospective transactions,"
id. at S15049, and "[a]ny pending judicial action, whether
it was brought in a trial or appellate court, by a private
party shall be subject to the grant of relief from liability."
Id. at S15050. The same history further explains that
"Congress intends that any third party action or joinder of
defendants brought by a private party shall be considered
a private party action, regardless of whether or not the
original lawsuit was brought by the United States." Id.
(emphasis added).

If the Act applies retroactively even to private-party
actions prompted by exempted federal judicial actions, it
makes no sense to conclude that it does not apply
retroactively to private actions pr ompted by non-exempt
administrative actions. Thus, these expressions of
congressional intent and others found thr oughout the Act's
legislative history, even if not controlling, clearly support a
common-sense construction of the Act that applies it
retroactively to private judicial actions such as this.

B. Due Process

Gould argues that if the Act applies r etroactively, then it
violates the Fifth Amendment's due process guarantee
because it lacks a rational basis. More specifically, Gould
argues, the Act:

> creates an arbitrary classification which r ewards a
> recalcitrant PRP who forced the United States to
> expend effort and its resources tofile suit, but
> penalizes a responsible PRP, like Gould, which agreed
> to clean up a battery-breaking site.

_____

1. Although there might be some question about reliance on a History
prepared by one senator and thereafter inserted with unanimous consent
because it does not appear to have been appr oved in substance by either
a Committee or a majority of the Senate, in this case we rely on Senator
Lott's History because Gould has not objected.

15

Appellee's Br. at 33.

To pass rational-basis review, however , the Act need only be justifiable on some rational basis. Mor eover, it is not necessary that Congress have actually articulated a particular rational basis. Instead, " `the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the recor d.' " Contractors Ass'n v. City of Philadelphia, 6 F.3d 990, 1011 (3d Cir. 1993) (quoting Heller v. Doe, 509 U.S. 312 (1993)). Here, the distinction between privately and federally initiated judicial actions is rationally related to pr eserving the public fisc. For instance, the distinction ensures that once the United States has expended public funds to initiate a judicial action, the Act does not render that expenditure wasted by exempting an otherwise covered person from liability. In affording such fiscal pr otection, the Act rationally distinguishes between the United States, a non-culpable party, and a party such as Gould who actually contributed to the contamination underlying its claim for contribution. That rationale is enough to pass constitutional muster. Thus, the Act can and does apply retroactively without violating due pr ocess.

C. The Act's Effect on The Summary Judgment

Having concluded that the Superfund Recycling Equity Act applies retroactively, the next issue is whether the Act exempts appellants from liability. Under the Act, a person who arranged for recycling of a recycling material is exempt from CERCLA liability with respect to that material. See 42 U.S.C. S 9627(a)(1). The Act defines a "r ecyclable material" to include, inter alia, spent lead-acid batteries. See id. S 9627(b). That definition is not limited to the lead contained in spent lead-acid batteries, nor to its casing, nor to any other individual or combination of individual components. The Act plainly and unambiguously defines the entire spent lead-acid battery as a "r ecyclable material." See id.

> [A] transaction involving spent lead-acid batteries . . .
> shall be deemed to be arranging for recycling if the

16

person who arranged for the transaction (by selling[the lead-acid batteries] or otherwise arranging the r ecycling of [the lead-acid batteries]) can demonstrate by a preponderance of the evidence that at the time of the transaction:

(1) The [spent lead-acid battery] met a comm ercial specification grade.

(2) A market existed for the [spent lead-acid b attery].

(3) A substantial portion of the [spent lead-ac id battery] was made available for use as feedstock for the manufacture of a new saleable product.

(4) The [spent lead-acid battery] could have  been a replacement or substitute for a virgin raw material, or the product to be made from the [spent lead-acid battery] could have been a replacement or substitute for a product made, in whole or in part, fr om a virgin raw material.

Id. S 9627(c), incorporated by reference into S 9627(e)(1).2

The parties' primary disagreement on this issue concerns whether the spent lead-acid batteries in question could have been a replacement or substitute for a vir gin raw material as the fourth element requires. Appellants argue that the requirement applies only to those portions of a spent lead-acid battery that are recyclable. Gould, on the other hand, argues that the "replacement or substitute provision" applies to the whole battery and that the Act does not apply unless every component of the spent lead-acid battery at issue is recyclable, and each component can be "a replacement or substitute for a vir gin material." Appellee's Br. at 38-54.

Stated differently, Gould concedes the third element requires only that "a `substantial portion' of the recyclable material was in fact made available for use as a feedstock in a manufacturing process." Appellee's Br . at 38 (emphasis added). But Gould argues that the fourth "element requires

_____

2. The Act's additional requirements for exemption from liability are not at issue in this case. See 42 U.S.C. S 9627(c), incorporated by reference in S 9627(e)(1); id. S 9627(i)(e)(2)(A).

a purported recycler seeking the protection of the statute to show that all, not just a `substantial portion' as in element 3, of the recyclable material `could have been' either a direct or indirect replacement for a raw material." Id. (emphasis added). Thus, Gould concludes, appellants are not covered by the Act because they sold Marjol spent lead-acid batteries made with non-recyclable rubber casings.

Gould's argument, and therefore its conclusion, fail for several reasons. First, the language of the Act itself belies Gould's argument. As previously noted, the Act defines a recyclable material to include the entir e "spent lead-acid battery." It makes no distinction between spent lead-acid batteries that are wholly recyclable, and those that contain non-recyclable components. This lack of distinction is all the more significant when considered in light of the Act's purposes, and the context in which it was passed. For instance, one of the Act's purposes is "to r emove the disincentives and impediments to recycling cr eated as an unintended consequence of the 1980 Superfund liability provisions." S. 1948 S 6001(a)(3), as enacted at 113 Stat. 1501A-598-99. In other words, Congress intended the Act to overrule court decisions holding bona fide sellers of recyclable materials liable under CERCLA. See, e.g., 145 Cong. Rec. S10391-01, S10431 (August 5, 1999) (Statement of Senator Lott) (noting that the Act was intended to "remove[ ] an unintended consequence of the Superfund statute" including court decisions holding "that recyclables are materials that have been disposed of and ar e therefore subject to Superfund liability").

Second, it is clear from the Act's legislative history that Congress realized not all components of "recyclable materials," including spent lead-acid batteries, are recyclable. For instance, the legislative history placed on the record for S. 1528 explains that:

> for a transaction to be deemed arranging for r ecycling, a substantial portion, but not all, of the r ecyclable material [e.g., a spent lead-acid battery] must have been sold with the intention that the material would be used as a raw material, in place of a virgin material, in the manufacture of a new product.

18

145 Cong. Rec. S14986-03, S15049 (November 19, 1999) (emphasis added).

Other unequivocal evidence that Congress did not intend to require that a "recyclable material" be 100% recyclable can be found throughout the Act's six-year legislative history. According to that history:

> The first part of [the fourth element] acknowledges the fact that modern technology has developed to the point where some consuming facilities exclusively utilize recyclable materials as their raw material feedstock and manufacture a product that, had it been made at another facility, may have been manufactur ed using virgin materials. Thus, the fact that the recyclable material did not directly displace a virgin material as the raw material feedstock should not be evidence that the requirements of [S 9627(c)] were not met.

> Secondary feedstocks may compete both dir ectly and indirectly with virgin or primary feedstocks. In some cases a secondary feedstock can directly substitute for a virgin material in the same manufacturing pr ocess. In other cases, however, a secondary feedstock used at a particular manufacturing plant may not be a dir ect substitute for a virgin feedstock, but the pr oduct of that plant competes with a product made elsewhere from virgin material. For example aluminum may be utilized at a given facility using either vir gin or secondary feedstocks meeting certain specifications. In this case, the virgin and secondary feedstock materials compete directly. A particular steel mill, however, may only utilize scrap iron and steel as a feedstock because of the design restrictions of the facility. If that mill makes a steel product that competes with the steel product of another mill, which utilizes a vir gin feedstock, the conditions of this paragraph have been met. In this example, the two streams of feedstock materials do not directly compete, but the pr oduct made from them do. It is the intent of this paragraph that the person be able to demonstrate the general use for which the feedstock material was utilized. It is not

19

        the intent that the person show that a specific unit was
        incorporated into a new product

Id. Thus, the language of the fourth element is intended to
explain when a recycling transaction is deemed to displace
the use of virgin raw materials, not to r estrict the Act's
coverage to materials that are 100% recyclable.

V. Conclusions

In summary, we hold that Congress intended the
Superfund Recycling Equity Act to apply r etroactively to
judicial actions initiated by private parties prior to
November 29, 1999, if still pending on that date. Gould's
contribution claims against Appellants meet those criteria.
Thus, the Act applies to Gould's claims, and the District
Court's order granting summary judgment to Gould on the
issue of contribution liability, as well as its judgment
allocating liability, will be vacated. We will remand the
cause to the District Court for it to determine whether
Appellants satisfy the Act's requirements for exemption
from liability.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

20